1
2
3

                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

4   UNITED STATES OF AMERICA       *   CRIMINAL NO. H-13-363
                                    *
5   VERSUS                          *   Houston, Texas
                                    *   June 19, 2019
6   JAMES WAYNE HAM                 *   10:00 a.m.

7                       PRETRIAL CONFERENCE
                BEFORE THE HONORABLE LYNN N. HUGHES
8                   UNITED STATES DISTRICT JUDGE

9   For the Government:

10          Ms. Jill Stotts
            Ms. Erin Michelle Epley
11          Mr. Sharad Sushil Khandelwal
            U.S. Attorney's Office
12          1000 Louisiana Street
            Suite 2300
13          Houston, Texas 77002

14          Mr. James Dennis Peterson
            U.S. Dept of Justice
15          1331 F Street Northwest
            6th Floor
16          Washington, DC 20530

17

18  For the Defendant:

19          Ms. Kimberly C. Stevens
            Assistant Federal Public Defender
20          And Capital Resource Counsel
            1070-1 Tunnel Road
21          Suite 10-215
            Asheville, North Carolina 28805

22

23

24  Proceedings recorded by mechanical stenography, produced by
    computer-aided transcription.
25

1   Appearances - Con't:

2

3   For the Defendant:

4           Mr. Anthony Seymour Haughton
            FPD, SDTX
5           440 Louisiana
            Suite 1350
6           Houston, Texas 77002

7

8

9   Court Reporter:

10          Fred Warner
            Official Court Reporter
11          515 Rusk Avenue
            Houston, Texas 77002

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Ms. Epley, are you going to take the
2   lead or does the best person?
3           MS. EPLEY:  I am doing the trial team, Your Honor,
4   but not as lead.
5           THE COURT:  Would you like to be the lead this
6   morning or would you like her to do it or somebody?
7           MS. STOTTS:  I think she is probably going to pass
8   that off to me, Your Honor.
9           THE COURT:  That's fine.  I am just trying to give
10  you a break.
11          MS. EPLEY:  Thank you, Your Honor.
12          THE COURT:  If the medical evidence or physiological
13  evidence that the government now has indicates that it's
14  likely that the victim had died before the car fire, why
15  don't we just stipulate to that?
16          MS. STOTTS:  Your Honor, the ME is going to actually
17  testify about other areas of her scope in this case with
18  regards to the decedent and what she saw, what she said.  It
19  would be better for us to have that presented to the jury.
20              As we told you before, we are standing by the
21  fact that she is not going to say that she believes she was
22  alive at the time.  What you are going to hear is one
23  question basically, she can explain why she believes she was
24  not alive and how she does believe that the death occurred
25  prior to the fire.  And that's why we would ask not to

1  stipulate to that evidence.  It's not going to be a long

2  presentation or anything like that, but since the ME is going

3  to be here anyway about the --

4        THE COURT:  I like data, but since this is not a

5  point in controversy and is reasonably gruesome --

6        MS. STOTTS:  May I respond?

7        THE COURT:  Yes, ma'am, of course.

8        MS. STOTTS:  Because this is a death penalty case

9  that we are talking about here, part of our aggravating

10  factors are how this death occurred and the heinousness of

11  the death, and we have to prove that to this jury.  And

12  although we are not going to go into it extensively --

13        THE COURT:  But if she was already dead from the

14  fire, the fire does not contribute to the heinosity.

15        MS. STOTTS:  I disagree.  I think it doesn't

16  attribute to the heinosity of the murder.  It does to the

17  coverup and what you do to someone who is now killed, you

18  drive their truck to another location and set it on fire.

19        THE COURT:  But isn't it common for people to

20  dispose of a body?

21        MS. STOTTS:  Yes, absolutely.

22        THE COURT:  And I suspect that Mr. Ham's apparent

23  selection is common?

24        MS. STOTTS:  I would agree with that.

25

1          THE COURT:  A couple of hundred years of reading
2     newspapers -- I am not that old; it just seems that long when
3     you read the newspapers -- that that seems to be a common
4     selection among the options.
5          MS. STOTTS:  I agree.
6          THE COURT:  Ms. Stevens.
7          MS. STEVENS:  Good morning, Your Honor.
8          THE COURT:  Does Mr. Ham want to get into that?
9          MS. STEVENS:  No, Your Honor.
10          THE COURT:  I will think about it.  But he is
11     charged with murder, and the murder, by the government's own
12     witness, occurred before the fire.  So while that's
13     unpleasant, there are other forms of body disposal.  Almost
14     any of them, they don't take those to a funeral home and have
15     them disposed of.
16          MS. STOTTS:  Your Honor, the evidence of the fire is
17     going to be a part of the case.
18          The stipulation that I believe Ms. Stevens is
19     talking about is what the ME will stipulate or whether we
20     will stipulate that the ME will not testify or would agree
21     that Ms. Youngblood was killed prior to the fire.
22          It's a small point.  We would like not to
23     stipulate to that point.  We would like for her to be able to
24     say, for these reasons we believe that she was killed in this
25     manner prior to the fire.

1          THE COURT:  She can testify about how she was

2   killed.  And so, her testimony apparently is she was killed

3   by a gunshot to the head.  Is that controversial so far?

4          MS. STEVENS:  May I approach the podium, Your Honor?

5   Actually that is.

6              Your Honor, on the first point as to the

7   stipulation, you and I talked about this very clearly, made a

8   record.

9              The Court said to Mr. Khandelwal:  "Though

10  you're making the claim that she was dead when she was

11  burned?

12              Yes, Your Honor."

13              You followed up.  "So the claim is that she was

14  dead when burned?

15              Yes, Your Honor."

16          MS. STEVENS:  Despite that, they refused to

17  stipulate.

18              We do not wish to get into this evidence.

19          THE COURT:  The government has a better lawyer now.

20          MS. STEVENS:  But, Your Honor, if the government is

21  now claiming she was likely --

22          THE COURT:  Sit up.  Mr. Khandelwal, sit up.  This

23  is not the dorm lounge.

24          MS. STEVENS:  Sorry, Your Honor.

25              That she was likely, that's a different issue.

1   That is not the stipulation that I thought we had ironed out
2   last time we were in the courtroom.  And in the absence of
3   that we do need to examine the evidence.

4             Now if they will be reasonable and stipulate,
5   as we discussed on the record and they said they would, we do
6   not need to get into this.

7             MS. STOTTS:  Your Honor, what we said on the record
8   is still the same.  She is going to say she was dead prior to
9   the fire.  Whether we stipulate to that or not, the evidence
10  isn't going to change.

11            She is not going to come in here and say she
12  was alive when this fire took place.  She is not going to say
13  that.  She hasn't ever said that.  She is not going to change
14  her mind and say that.

15            MS. STEVENS:  Your Honor, I am sorry to be so
16  confused, but here's their answer:  "We do not need to
17  stipulate to this.  The medical examiner will testify at
18  trial that the decedent was likely not alive at the time the
19  defendant set the car on fire."

20            That is an entirely different question.  It is
21  not a small point.

22            THE COURT:  You mean between dead and likely?

23            MS. STEVENS:  And likely, right.

24            The jury can say, well, she likely was.  She
25  may not have been.

1          A stipulation that she was dead before burned,

2    the government has the burden of proof.  It sounds like

3    they're attempting to use the fire as an aggravating factor

4    in support of a claim for the death penalty.  And so it is

5    very important that if they are not going to --

6          THE COURT:  I'm going to worry about that

7    aggravation stuff once I have something to sentence.

8          MS. STEVENS:  It is also relevant, as you point out,

9    Your Honor, to the guilt phase.  Leaving doubt in the jurors'

10   minds about likely dead before burned may have them back in

11   the jury room discussing that she may have been alive and

12   burning to death, and that's a different question.

13         THE COURT:  Well, if it's likely that she had died

14   from the gunshot wound and the evidence seems fairly clear.

15         But if you die of a heart attack after you're

16   shot, does that count as being killed by the gunshot?

17         MS. STEVENS:  No, Your Honor.

18         THE COURT:  I mean, I don't know.  I'm just,

19   fortunately --

20         MS. STEVENS:  There can be but one cause of death

21   for all of us.

22         THE COURT:  My favorite description was the Dallas

23   coroner reported that Lee Harvey Oswald died of cardiac

24   arrest.  The bullet holes in four major organs apparently

25   didn't strike them as having any impact on it.  We all die of

1 cardiac arrest.

2          MS. STEVENS:  True, Your Honor.

3          THE COURT:  Maybe they should have a rubber stamp.

4               For you young people, he was the assassin of

5 President Kennedy, apparently, since he was never tried; but

6 I don't think there is much doubt about that, although people

7 have made a fortune selling books coming up with all kinds of

8 strange -- and movies.

9               I don't know what a recut is.  One of the items

10 is H&E stained recut.

11          MS. STEVENS:  Your Honor, I am not a pathologist,

12 but my understanding is they take tissue samples and they

13 slice them very thinly, place them between two glass slides

14 and a later pathologist can look at those tissue slides to

15 see what's important to a medical examiner.

16          THE COURT:  Okay.  Such as the intra-pathologist.

17          MS. STEVENS:  It is intra-pathologist language.  And

18 so he made a specific request to us:  This is what I need to

19 examine.  We passed that along to them.

20          THE COURT:  And a DICOM file.  DICOM in all capital

21 letters, Fred.

22          MS. STEVENS:  Your Honor, I believe that is an

23 electronic form.  So a full set of radiographs.  But it's

24 reduced to an electronic, like a thumb drive, some type of

25 file that he can later open on his computer.  So that first

 1  one is not actual biological material.

 2              The second, the recut slides, would contain

 3  biological material.

 4          THE COURT:  Where does your pathologist reside?

 5          MS. STEVENS:  He is in Minnesota, and his address is

 6  on is the last page of our motion.

 7          THE COURT:  I wasn't paying attention to that until

 8  the transportation issue came up then.

 9          MS. STEVENS:  Now another alternative, Your Honor,

10  is we could have --

11          THE COURT:  The grandfather for whom I was named was

12  from Minnesota.  Can I recuse?  Just a thought.

13          MS. STEVENS:  My grandmother was from Minnesota.

14  Can I recuse, Your Honor?

15          THE COURT:  You will have to do all three roles.

16              Let me think about that.

17              Which medical examiner did this, Harris County?

18          MS. STOTTS:  It was Harris County.  She is now in

19  Montgomery County but still a medical examiner.

20          THE COURT:  I just wondered about the institution.

21          MS. STOTTS:  It's Harris County, Your Honor.

22          THE COURT:  Let me think about that for a minute.

23  So I wouldn't have gotten comfortable.

24          MS. STEVENS:  I was letting the Court think about

25  that one.

1          THE COURT:  Despite my views of the death penalty

2     determination process, I don't understand how that has

3     anything to do with a trial of the acts of the crime.

4          MS. STEVENS:  Well, it's about manner of death, Your

5     Honor, what actually killed her.  Was it a gunshot or did she

6     die in the fire?  And we have to examine that evidence to be

7     effective.

8          THE COURT:  No.  The conversation between Ruben

9     Perez and the deputy assistant or, apparently, according to

10    some, that they all sat around and talked to the attorney

11    general, the decision on the death penalty is none of those

12    people knew anything except hearsay.  They're a bunch of

13    government lawyers getting together in a conference room in

14    D.C. at great expense.

15         MS. STEVENS:  I was still talking about the

16    pathology evidence.  You moved on to the second motion then.

17    I'm sorry, Your Honor.

18         THE COURT:  No.  I should have announced.

19         MS. STEVENS:  I was still thinking.

20         THE COURT:  Act 2.

21         MS. STEVENS:  All right.  Act 2.  So it's Docket

22    Entry 129, Your Honor.

23         THE COURT:  That's what mine says on it, yes, ma'am.

24         MS. STEVENS:  Yes, Your Honor.

25              To quote the brief, "wise observers have long

1  understood that the appearance of justice is as important as
2  its reality."

3         THE COURT:  No, it's not.  Justice comes first.  If
4  you reach justice in a way that say is not public, then it's
5  not justice.

6         MS. STEVENS:  Yes, Your Honor, yes, sir.

7         THE COURT:  That aphorism could be used by devious
8  government lawyers to say, we skipped the justice.  We'll
9  just make it look like justice.

10         MS. STEVENS:  Oh, to be sure, both are required,
11  both are required, Your Honor, I agree with the Court.

12              The DOJ prosecutor here -- and bear with me,
13  Your Honor, this may take a little explaining -- faced
14  allegations of serious governmental conduct, particularly
15  hiding Brady evidence, in a separate pending capital case,
16  U.S. versus Andrew Rogers, and findings of misconduct were
17  found.  The Court found that his assurances that he did
18  provide Brady "rang hollow in that case."  He was ordered to
19  be deposed, and the government moved to keep that sealed.

20              And one day before he was scheduled to publicly
21  testify, the government removed the hammer of death, allowed
22  the entry of a plea and the misconduct there was quieted.

23              In this case, Your Honor, Mr. Peterson is
24  practicing law and signing pleadings in Texas while it
25  appears that his bar license has been administratively

1  suspended for failure to pay bar dues by the Texas State Bar.

2  The rules of this Court --

3          THE COURT:  No.  I notice those things.

4          MS. STEVENS:  Yes, Your Honor.

5          And the Texas Disciplinary Rules of

6  Professional Conduct speak directly to this.  Rule 8.4A, "a

7  lawyer shall not" -- forgive me for being nervous, Your

8  Honor.  I haven't had to do this before in 27 years -- "shall

9  not engage in the practice of law when the lawyer's license

10  is suspended, including but not limited to situations where a

11  lawyer's right to practice has been administratively

12  suspended for failure to timely pay required fees or

13  assessments."

14          Now, in this case we also know, Your Honor,

15  that the great State of Texas requires more of a prosecutor

16  than Brady.  Rule 8.4 A1 and A11 speak so to his license, but

17  Texas Disciplinary Rule of Professional Conduct 3.09 D say

18  that his discovery obligations exceed those commanded by

19  Brady.

20          Now, the government claims first that our

21  motion should be denied because the discovery that we are

22  seeking does not bear on guilt, innocence or punishment but

23  rather the processes by which death was authorized in this

24  case.

25          We go beyond that in our request, Your Honor.

1   We request the entire file of Mr. Peterson, the entire file
2   of Mr. Mellin, which should include law enforcement reports,
3   handwritten notes, prosecutor handwritten notes, much of
4   which may bear both on guilt/innocence and the penalty in
5   this case.
6              And if I may take a moment to explain and hand
7   up, as it's a short one, Your Honor, it took me a while to
8   find this, but a four-page order entered by the Court in the
9   Rogers case which explains Mr. Peterson's conduct there with
10  regard to interviewing mental health witnesses.  And we have
11  some similar issues I would like to raise with the Court in
12  this case, if I might approach.
13             THE COURT:  First of all, let's assume I shoot
14  Peterson this morning.
15             MS. STEVENS:  Yes, Your Honor.
16             THE COURT:  They seem to have seven or eight other
17  lawyers.  And do we suspect there is exculpatory data that
18  are not disclosed?
19             MS. STEVENS:  I do not know the answer to that
20  question, Your Honor, because we don't have the discovery.
21  But I have reasons to suspect, based on his pattern of
22  behavior at the same time that the Ham case was pending and
23  the fact that no other DOJ lawyer has apparently been
24  assigned to Ham.  Mr. Peterson has been handling it since
25  2016, and Mr. Mellin before him.

1          What we do know is that their colleague and

2    fellow DOJ prosecutor, Amanda Haines, swore that in two

3    separate capital cases ending at the same time they were

4    involved in the Ham case, they hid Brady evidence, that Mr.

5    Peterson took handwritten notes and destroyed them and lied

6    about it or he failed to take notes altogether and he failed

7    to keep a record of what he showed a mental health doctor.

8          The court order that I handed up in Rogers,

9    Your Honor, talks about a local prosecutor submitted a

10   memorandum in which the U.S. attorney in Rogers recommended

11   that they not seek the death penalty as to Andrew Rogers.

12   That position was reversed later in 2015.

13         And what happened in the interim was that Mr.

14   Peterson interviewed the chief psychologist, Dr. Steven

15   Eckert, at FCC Terre Haute.  What the memo that was later

16   turned over in discovery to the Rogers court after the

17   government represented there was no Brady evidence to be

18   turned over, there was nothing that they were hiding.

19         This document surfaced, and in this document

20   AUSA James Warden said that he had interviewed the same

21   psychologist who said to him BOP, the Bureau of Prisons, was

22   not as responsive to Rogers' mental health issues as it could

23   have been and that certain additional intervention could have

24   occurred prior to the murder, and further, the Bureau of

25   Prisons might be embarrassed as a result of its incomplete

1   response to Rogers' mental health issues.

2           When this document surfaced and AUSA Warden

3   explained the reason for the reversal of the local U.S.

4   attorney's position and now that they were seeking death, Mr.

5   Peterson had been in speaking with Mr. Eckert, and the chief

6   psychologist now was claiming the defendant did not manifest

7   symptoms of any mental health malady according to the

8   government, according to the government.  And the Court said,

9   I find that your assurances that you have complied with Brady

10  ring hollow.

11          Your Honor, we don't know.  AUSA Warden and the

12  chief psychologist Eckert were deposed in Rogers, as was Mr.

13  Peterson and Ms. Haines.  Those are sealed.  The case has

14  been closed.  The docket was closed.  So we're asking --

15          THE COURT:  Why is the docket closed?

16          MS. STEVENS:  I don't know, Your Honor.  We searched

17  it.  We searched it this morning before coming here to see if

18  any of these pleadings have been unsealed, and they have not.

19          THE COURT:  Do we know why?

20          MS. STOTTS:  I don't know why, Your Honor.  I have

21  people here who may know why, but I definitely don't know

22  why.

23          MS. STEVENS:  And so, as the Court may recall, Mr.

24  Ham was sent to Butner for a competency evaluation on motion

25  by his lawyers, Ms. Scardino and Mr. Morrow at the time; and

1   we found a reference in the discovery that Mr. Peterson hand

2   delivered documents to Butner.  We don't have a record of

3   what was said when he hand delivered those documents.

4           THE COURT:  Is that right?  I am asking you.

5           MS. STOTTS:  It could be correct.  I need to check

6   with Mr. Peterson.  But I know that there were documents

7   taken to Butner.  I don't know if he hand delivered them.

8           THE COURT:  Well, see, you're talking like a

9   government lawyer.

10              Documents were delivered?

11          MS. STEVENS:  Yes, Your Honor.

12          THE COURT:  Okay.  What were they?

13          MS. STOTTS:  Without looking in the big file, Your

14  Honor, which I could do, I am not sure exactly what was given

15  to Butner at that time, at the time she is talking about.

16          THE COURT:  And if they're all just in a pile, how

17  would some person like you know that they were delivered or

18  not delivered at the time or before or any other time?

19          MS. STOTTS:  I have the same discovery information

20  that Ms. Stevens does.  I am just not clear on whether the

21  information she is talking about was hand delivered to

22  Butner.

23              Mr. Peterson is here.  He can tell me whether

24  he hand delivered it.  I don't want to give the Court wrong

25  information.

1        THE COURT:  No.  I understand.

2        MS. STEVENS:  The brief information we have, Your

3   Honor, is that on December 16, 2015, Mr. Peterson hand

4   delivered records to a Dr. Wadsworth at Butner.  This was one

5   month after he was speaking with chief psychologist Eckert in

6   the Rogers case at FCC Terre Haute.  So we have this conduct,

7   Your Honor.  We can point to that in support our discovery

8   request.

9        Further, we know that in July of 2014 Ms.

10  Scardino appeared at main justice with her mitigation

11  specialist Mona Carmoni.  It is clear they are both female,

12  they appeared under a Kevin Carlisle-led DOJ hearing, and Mr.

13  Carlisle was accused at various points of running an office

14  filled with various sexually inappropriate conduct going on.

15        But aside from that, what's more important --

16        THE COURT:  Ms. Scardino is a capable, responsible

17  woman who can take care of anybody who applied unappropriate

18  standards to her.

19        MS. STEVENS:  I have no doubt that she is a capable,

20  strong woman.  And she argued this at main justice in that

21  atmosphere.

22        But what's more important, Your Honor, is that

23  Amanda Haines, in her sworn declaration, said that the Brady

24  misconduct by Mr. Peterson and Mr. Mellin both that she found

25  in the other capital cases she reported to Mr. Carlisle in

1   this general time frame.  He instituted no investigation and
2   did nothing.  He chaired the committee that held the
3   authorization hearing in the Ham case.
4           In October Attorney General Holder authorized
5   the death penalty.  The records of this Court reflect that
6   on October 21 Steven Mellin appeared in the courtroom minutes
7   so was apparently handling this case on behalf of DOJ.  And
8   Peterson appears in 2016, signing the superseding indictment,
9   entering an appearance in August of 2016 and signing various
10  notices of intent, all while apparently his Texas bar
11  licensed is administratively suspended in violation of the
12  rules of this Court.
13          According to Mr. Peterson, he became barred in
14  Virginia and after a period of years abandoned his Texas bar
15  license.  According to him, the printout from the Texas bar
16  reflects that abandonment, not discipline.  Respectfully,
17  Your Honor, the Texas State Bar rules say otherwise; and so,
18  he denies what we can plainly see.
19          THE COURT:  Well, if he didn't have or not have is
20  kind of a clear dichotomy.  You have a license or you don't.
21          MS. STEVENS:  Yes.
22          THE COURT:  If it's suspended, you don't have one.
23          MS. STEVENS:  I agree, Your Honor.  And he
24  apparently is taking the position that because he holds a
25  valid Virginia license, it doesn't matter that his Texas bar

1  license is suspended; but that's not what the rules of ethics
2  or the rules of this Court say.  They don't forgive you if
3  you hold a license in another state that you haven't paid
4  your bar dues since 1995.
5            Now, one question --
6            THE COURT:  I am not opposed to Virginia lawyers.
7  Some of my best friends, like Jimmy Madison and those people,
8  even they got a bar license by saying I'm a lawyer.
9            MS. STEVENS:  Yes, sir.  And I understand you went
10 to the University of Virginia.
11           THE COURT:  I did.  I finally had to clean up my
12 U.T. education.
13           MS. STEVENS:  One question was whether he reported
14 the Texas suspension to Virginia.  I don't know.  I also
15 don't know that that's relevant.  The fact is, he is
16 suspended and has signed pleadings here in this case.
17           THE COURT:  Rather more significant is other
18 behavior than --
19           MS. STEVENS:  It is rather more significant, Your
20 Honor.  And it points to the need for the granting of
21 discovery of his complete file, Mr. Mellin's complete file.
22 They apparently lacked supervision for what Ms. Haines
23 reported as violations of Brady.
24                 And so that is the basis for our motion, Your
25 Honor.  The discovery that we are seeking could well show

1   Brady evidence.

2           THE COURT:  The justice department, after a thorough

3   investigation, decided that the local U.S. attorney counsel

4   in the Senator Stevens lynching used poor judgment.  That was

5   the sole discipline, other than the one assistant who killed

6   himself, which is some sort of confession.

7               In Edwin Wilson versus United States, the

8   evidence was that the CIA gave the justice department an

9   affidavit about the absence of contacts by the defendant with

10  the agency after he had left being an active officer.  The

11  next day the Assistant Attorney General for Criminal, since

12  that's the highest working lawyer, received a letter from the

13  general counsel at CIA and not in some bureaucratic,

14  convoluted thing, I think it's two sentences, said, you

15  received an affidavit from so in so and so in so yesterday.

16  You cannot use it.  It is perjury.

17              And so the Assistant Attorney General and three

18  or four more people, including the one from the office here,

19  met for 40 minutes or so and decided, well, we really

20  shouldn't use it, but we'll just paper the file.  And Mr.

21  Wilson spent 17 years in prison before I appointed a lawyer

22  who on his habeas uncovered 126 documented contacts between

23  him and the CIA.

24              Neither lawyer, neither trial lawyer was

25  punished.  It was hard to punish the former Assistant

1    Attorney General because he was a District Judge at that
2    point, and actually so was the former head of the CIA, who
3    did everything perfectly.

4              They're not inclined to admit their errors or
5    do anything about it once they get them.

6         MS. STEVENS:  Or unseal that docket in Rogers or let
7    us read the deposition.

8              I believe we require this Court's assistance,
9    Your Honor.  We require this Court's assistance to provide us
10   the discovery.  It is not right for them to say the defense
11   can't prove we engaged in any misconduct.  There is every
12   indication of prior Brady violations.  Texas requires the
13   production of more than Brady.  We have indications that we
14   are missing things.

15        THE COURT:  I am not sure that procedural rule
16   applies to me, but I have actually read the Constitution, and
17   hiding exculpatory evidence seems -- I bet you even one of
18   those funny-dressed king's judges would have come to the
19   conclusion that it's not cricket, I think would be the legal
20   term.

21        MS. STEVENS:  Even assuming it does not, Your Honor,
22   and we believe that it does, but assuming that it does not,
23   they are still bound by Brady, by the Sixth Amendment, the
24   Eighth Amendment, Giglio.

25             We have indications that we are missing

evidence, and we need this Court's help in granting the
discovery.  It is not right just to say they can't prove it
and deny us the evidence that it takes to prove it.

We have not yet moved for sanctions, it's true,
because we need the evidence first.  And then we will see
what motions may follow.  And producing their complete files,
their handwritten notes, their interview notes is necessary;
and it's not just about the authorization of this case,
though to be sure it includes that, it includes their
subsequent failures and refusals to take a plea, to
de-authorize, witness interviews are going on.  We are in the
field conducting our interviews and have heard from witnesses
that the government has conducted them, and we have no notes
of those contacts.

And so we believe we are entitled to their
files, Your Honor, if this Court would assist us and grant
the discovery and at least allow us to read what was deposed
and put into evidence in the Rogers case that the government
was able to quiet and close by allowing him finally to plead
one day before the evidentiary hearing.  It's not right.

MS. STOTTS:  Your Honor, the allegations in the
Rogers case are separate and apart from anything that has
happened during the Ham case.  Those allegations have been
not substantiated at this point; and although I don't
condone, obviously, any violation of Brady or anything else,

1  there is nothing here in this case to show that anything has
2  been done at all.

3  THE COURT:  Why haven't the records of the
4  government's interviews of witnesses she mentioned been
5  produced?

6  MS. STOTTS:  Your Honor, anything that is not work
7  product has been provided to --

8  THE COURT:  But see, the problem is, I don't know.

9  MS. STOTTS:  The handwritten notes from the agents
10  have been provided, handwritten notes from the deputies that
11  were out on the scene have been provided, from the Texas
12  Rangers have been provided.

13  The only notes that, if they exist, have not
14  been provided are specific notes taken by prosecutors.  I
15  don't even know if those exist.  I will tell you now, I have
16  them.  So I don't know if they exist from other people in
17  this case, but they would be work product.  If there is
18  anything Brady that comes out of a conversation, obviously --

19  THE COURT:  I don't know that they're work product
20  when their existence is hidden.

21  MS. STOTTS:  Your Honor, they're work product unless
22  they have something exculpatory that has come out of them.
23  If that occurs, then obviously they are turned over to
24  defense counsel.

25  THE COURT:  But that puts the defendant in the

1  position of having to prove the government's got evidence.

2  The duty rests with the government.

3      MS. STOTTS:  I agree.  The duty to provide all Brady

4  material --

5      THE COURT:  No.

6      MS. STOTTS:  -- rests with the government and all

7  evidence.

8      THE COURT:  To do justice.

9      MS. STOTTS:  I agree.

10     THE COURT:  It's called the justice department for a

11 reason.

12     MS. STOTTS:   I agree.

13     THE COURT:  It's not called the California Shyster

14 Agency.  Sort of sorry I used California.  Bad as it is, it's

15 not D.C.

16         And the point of the Rogers case was not that

17 the facts of that case in terms of the offense are relevant,

18 but that the government process is tainted by character that

19 doesn't change from case to case.  The lawyers in Ohio or

20 wherever it was that tried Stevens had probably done the same

21 thing in thousands of cases.  Just an honest FBI agent in

22 those cases didn't go to the Judge.

23     MS. STEVENS:  That is our position, Your Honor.

24     THE COURT:  Pardon?

25     MS. STEVENS:  That is our position.

1          THE COURT:  All right.  I am thinking.
2               What else?
3          MS. STEVENS:  That's all for now, Your Honor.  I
4  think we should let you think, unless you have further
5  questions of me.
6          THE COURT:  Not at the moment.
7          MS. STEVENS:  Yes, sir.
8               Your Honor, may I introduce Ms. Brandi Riddle.
9  She is our paralegal, and I'm sorry for neglecting to do so
10 when we first opened.
11         THE COURT:  I am glad she is introducing you because
12 I like to meet the people who do all the work.
13         MS. STEVENS:  You can see the notebooks in front of
14 her.  She keeps us straight, Your Honor.
15         THE COURT:  Thank you for doing it because they're
16 all a mess now, but think what they would be without
17 paralegals and secretaries.
18         MS. STEVENS:  True.
19         THE COURT:  And interns who work for free.  They're
20 great.  Thanks.
21         MS. STEVENS:  Thank you.
22         THE COURT:  Let's take a -- you may need to
23 confer -- 15 minutes.
24         MS. STOTTS:  Thank you, Your Honor.
25                    (Recess taken)

1        THE COURT:  Ms. Stevens, explain to me again about

2   the interviews.

3        MS. STEVENS:  Yes, Your Honor.  What we do know

4   about the interviews --

5        THE COURT:  There was a please in there somewhere.

6   You just didn't hear it.

7        MS. STEVENS:  Oh, that's all right.  Thank you.

8            So we know two things about the interviews in

9   this particular case.

10       THE COURT:  Get a little closer to the microphone.

11       MS. STEVENS:  Yes, Your Honor.  I'm sorry.

12           That Mr. Peterson hand delivered documents in

13  December of 2015 to Federal Medical Center Butner and a

14  psychologist there.  And our team, of course, is out trying

15  to interview the witnesses; and some of the witnesses that we

16  have interviewed have told us that they were interviewed by

17  federal agents, and we have no reports of those.

18           And I say that not because we can be exhaustive

19  in that.  I don't know who all they have interviewed, and we

20  don't have notes.  But the fact that we are hearing it from

21  anyone is troublesome.  So some of the witnesses specifically

22  told us that they were interviewed, they were interviewed

23  downtown in a federal building and that we have no notes of

24  those.

25       THE COURT:  Downtown here?

1          MS. STEVENS:  Yes.  One interview says on Louisiana

2     Street.

3          THE COURT:  That's close enough for a civilian.

4          MS. STEVENS:  And then another thing we noticed in

5     the transcript where Postal Inspector Boyden is interviewing

6     our client, Mr. Ham, he says that that morning he did a

7     lengthy interview of one Stephanie Kent, and we don't have

8     the interview summary of that.

9              And so I am not trying to list everything we

10    don't know, Your Honor, because we don't know how many

11    people, but we are receiving indications that there are items

12    we don't have.

13         THE COURT:  Okay.

14             Donald Rumsfeld said, the problem's not what we

15    know we don't know, it's what we don't know we don't know.

16         MS. STEVENS:  And the older I get the more I know

17    there's things we don't know, but we are hearing back that --

18         THE COURT:  It's always been large.  The size of the

19    unknowns hasn't changed; you've changed.

20         MS. STEVENS:  I have gotten older, Your Honor.

21             So we are hearing that interviews had been

22    conducted that we don't have.

23         THE COURT:  Thank you.

24         MS. STEVENS:  Yes, sir.

25         THE COURT:  Do we have a list of what Mr. Peterson

1  has done in this case?  I mean, he has interviewed, meetings
2  he attended, just the data, the facts of an interview and
3  some identification of who the person is?

4          MS. STOTTS:  I do not have a list of who he may have
5  interviewed.  I don't believe there are any interviews that
6  he conducted himself.  If there were meetings that he was
7  present at, there should be notes either by the agent or by
8  one of the prosecutors with regards to who was there, I would
9  think.

10          THE COURT:  Would he perhaps have had the authority
11  to direct agents where to go and whom to ask?

12          MS. STOTTS:  Could he have?  I guess that's a
13  possibility.

14          THE COURT:  Well, have most the witness interviews
15  been conducted by your office or your office directing the
16  agents?

17          MS. STOTTS:  Typically our witness interviews
18  pretrial, which is where we're at, obviously are the agents
19  and the prosecutors talking to the witnesses.  We are getting
20  ready for trial.  I think the Court would be disappointed if
21  we didn't talk to our witnesses.  That's where we're at.
22  But, yes, that has occurred.

23          THE COURT:  Disappointed or somewhat worse.

24          MS. STOTTS:  Right.

25          THE COURT:  I want a narrative of Peterson's

1    contributions revealing nothing that is work product or top

2    secret otherwise, and I want everything about the delivery of

3    the documents and the interviews at Butner and everything

4    about the interviews of the witnesses that Ms. Stevens

5    identified or will identify if it's not.

6            MS. STOTTS:  With regard to Mr. Peterson?

7            THE COURT:  No.  About -- I don't care whether

8    Peterson did it or you did it, if you took documents to

9    Butner, and what they were.

10           MS. STOTTS:  I can assure you that that wasn't me.

11   That was Mr. Peterson.

12           THE COURT:  I can tell because they wouldn't let you

13   out if you went in.

14               And I don't want to get into the Rogers case.

15   The facts about it that I do know do not shed light favorably

16   on the justice department representatives and their

17   supervisors.  The supervisors always want to blame the online

18   troops who weren't given the information to start with.

19               We do have that rule; but someone who has a

20   license from any other American jurisdiction could perhaps be

21   admitted for this case alone, but it requires disclosure of

22   whatever happened with the Texas license.

23               It seems to me that someone who no longer

24   thinks she needs a Texas license -- actually one of my

25   colleagues who is no longer with us, he quit paying his bar

dues and just resigned.  That piece of paper in chambers from
the President makes, I guess, a higher ranking than the state
bar.  They were confused by the concepts, but I have kept up
until I got so old they didn't want my money anymore.

I would write the state bar and say, I'm
practicing with the government in Washington and I am going
to rely on that license from now on, but thank you very much
so you didn't leave this question about how your licenses
came or went.

We've had a President who lost his license, and
the record is sealed on that, too.

At the moment until I have the other data, all
I will say is I think America could probably find a better
representative of its principles and ideals than Mr.
Peterson.

I am going to run down the written list to make
sure I didn't omit something.

On Mr. Ham's list, number one is redact what
you need to, but we need Peterson's involvement in the case.
All the meetings, all the conferences, with whom, and you can
do, I'll assume, something important.

MS. STOTTS:  Yes, Your Honor.

THE COURT:  Two, about all his emails, or you might
look at them, but not all of them.

And I do think he should have -- I think it's

1  included in the first one, but authorizations or requests for
2  authorizations of investigations except No. 3 should be
3  included in 1.

4              What's Mellin's case against Ham?

5              MS. STEVENS:  Before Mr. Peterson began handling
6  this case somewhere in 2015, we believe Mr. Mellin was
7  handling the Ham case on behalf of the Department of Justice;
8  and he appeared on the record in 2014 in the Court's docket
9  entry, and so we believe early in the case, 2013 to 2015, he
10 would have been the DOJ representative handling the Ham case.
11 And he, too, was a subject of Amanda Haines' declaration for
12 having hidden Brady evidence in United States versus Stanley
13 Hammer, a separate capital case at that time.

14             THE COURT:  Have you seen all of that early stuff?

15             MS. STOTTS:  Have I seen all the early stuff?  We
16 have everything that's been done throughout this case, Your
17 Honor, yes.

18             THE COURT:  Do you have Mellin?  And that's
19 M-e-l-l-i-n.  Have they seen everything he did and all the
20 memos of his meetings?

21             MS. STOTTS:  The same as with any other meetings
22 that were conducted by the Department of Justice or the U.S.
23 attorney's office, work product, we have not turned those
24 handwritten notes over, no.  We believe they're privileged
25 unless they contain Brady information.

 1          THE COURT:  But that's it.  Somebody's got to read
 2  them.
 3          MS. STOTTS:  Right.
 4          THE COURT:  But no.  I don't want where they are
 5  arguing about who has to do what in the case.
 6          MS. STOTTS:  Your Honor, if it satisfies the Court,
 7  I will talk to Mr. Mellin and find out if he conducted any
 8  early witness interviews, has any notes that I haven't seen
 9  and make sure that we have all of those in our case files for
10  me to review.
11          THE COURT:  All right.
12          MS. STEVENS:  We have seen nothing from him, Your
13  Honor.
14          THE COURT:  Well, one plausible answer is he didn't
15  do anything.
16          MS. STOTTS:  Correct, Your Honor.
17          THE COURT:  And if there is something that you think
18  might be, I could appoint a special master to look at it so
19  even I wouldn't know what was in its unless he reported it as
20  disclosable.
21          MS. STOTTS:  Your Honor, I will speak with Mr.
22  Mellin.  I believe that your answer about the fact that he
23  probably doesn't have anything with regard to the case and
24  possibly had it done two months before we got Mr. Peterson
25  may be correct, but I would like to speak with him and make

1  sure.  So it was very early on in the case.

2         THE COURT:  You know, the notes of the discussion

3  about the use of the perjured testimony could have been

4  argued to have been attorney/client privilege except

5  committing a crime is not covered; and while not all

6  violations of bar rules and ethics are crimes, we need to see

7  those.

8         Yes, ma'am.

9         MS. STEVENS:  The Court brings up an interesting

10  point.  The Court is correct.  Where there is reason to

11  believe the documents sought may shed light on governmental

12  misconduct, the deliberative process privilege is and should

13  be denied, and so hiding behind privilege may not be the

14  right thing for them to do.

15         THE COURT:  That's what I thought I just said.

16         MS. STEVENS:  It is.  It is what you said.

17         THE COURT:  When you find the dead skunk, put it in

18  the box addressed to her.

19         MS. STOTTS:  Absolutely.

20         THE COURT:  What is a CCS attorney?

21         MS. STOTTS:  That's the Capital Crimes Section.

22         THE COURT:  Oh, isn't that cute?

23         Do you know anything about his ethics or him

24  being asked or asking other people to do crooked, unethical

25  stuff?

1    MS. STOTTS:  I do not, Your Honor.  I don't have any

2    information that he was doing anything crooked or dishonest.

3    THE COURT:  Well, see if there are complaints by --

4    of course, some employees would file a complaint if you asked

5    them to work.

6         Is the Blue Book secret?

7    MS. STOTTS:  I believe it is secret, Your Honor.  I

8    don't know what you mean by "secret," but it is something --

9    THE COURT:  It's unread by most lawyers.

10    MS. STOTTS:  It's not read by the public.

11    THE COURT:  I had a case where an agency filed a

12   200-page privilege log -- that's just a log.  I suggested

13   that they ought to rethink some of that, and so they came up

14   with a 20-page privilege log.

15        So I appointed a retired appellate judge as a

16   special master, and in his report he said one of the first

17   things he found had been marked privileged was the Justice

18   Department's letter to the agency describing what was and was

19   not discoverable.  And then he said, I used that as the

20   standard for evaluating the rest of it, and he found four

21   pages, not four of the 20-page log, but four pages that were

22   probably privileged, but things that were about other cases

23   entirely that simply had been misfiled had been marked

24   privileged.

25        Can Ms. Stevens see a copy of the Blue Book?

1    MS. STOTTS:  Your Honor, I don't even know if I can
2    see a copy of the Blue Book.  I am sure I could find one.
3    It is privileged.  Courts before you have held it was
4    privileged, that it's not to be disseminated to defense
5    attorneys or to the public.  But I don't know --
6    THE COURT:  Wait a minute.  The public's an entirely
7    different question.
8    MS. STOTTS:  I understand.
9    THE COURT:  Were these courts in D.C.?
10   MS. STOTTS:  It's in our brief, Your Honor.  I can't
11   remember where the courts were.  I have it marked somewhere.
12       Two cases that are cited in the response that
13   we gave, one is the National Association of Criminal Defense
14   Lawyers versus the United States Department of Justice, which
15   is 844 F3d, 246, that says the internal Department of Justice
16   publication known as the Blue Book constituted attorney work
17   product because it's aimed directly for use in litigating
18   cases.
19       There is another --
20   THE COURT:  That's like having rules about what your
21   margins are on the paper.  They apply to all cases, and it's
22   not privileged.  Telling them to obey the law or to disobey
23   the law would not be privileged.
24       I'm sorry.  Keep going.
25   MS. STOTTS:  I don't believe that's what the book is

1  going to say, Your Honor.  Again, I can look at the Blue Book

2  and report back to the Court.

3          THE COURT:  What's the other citation?

4          MS. STOTTS:  The other citation is United States V.

5  Etlin, 134 F Supp, 2nd 59 at 89.  And that says even if the

6  discovery has proven appropriate in this case, the materials

7  sought by the defendant Etlin are largely privileged under

8  the attorney/client privilege, the Work Product Doctrine and

9  the delivery of the process is privileged.

10         THE COURT:  Well, I don't know what the other ones

11 were, but you know a committee wrote it, some of whom

12 probably weren't lawyers.  And the publication of a manual

13 doesn't sound like it's deliberative.  It had to be a

14 particular decision to be deliberative.  When you write a

15 global rule, that's not deliberative.

16             Find one, thumb through it.

17         MS. STOTTS:  Yes, Your Honor.

18         THE COURT:  Did the Senate committee get to look at

19 it?

20         MS. STOTTS:  I don't know.

21         THE COURT:  It was discussed before the Special

22 Council on the Senate Committee on the Judiciary.

23         MS. STOTTS:  I don't have an answer to that.  I

24 don't know.  I will get my hands on one to see what it

25 entails.

1        THE COURT:  If you have trouble sleeping it will
2   probably help.
3            All right.  21.  I don't want to get it
4   sidetracked, but I think they ought to look at this since
5   it's public now.  That's the United States versus Rogers
6   stuff.
7        MS. STOTTS:  The depositions, Your Honor?
8        THE COURT:  All that stuff she listed there.
9        MS. STOTTS:  I believe those are still sealed and
10  not public.
11       THE COURT:  Who sealed it?
12       MS. STOTTS:  The court in Rogers.
13       THE COURT:  Why do these courts go around sealing
14  everything?  I am adverse to that.
15           I tried a spy, and they wanted to seal up the
16  courtroom and seal everything.  I mean, the only thing I
17  could think, if we sealed the witness's mouths, it would
18  shorten the whole thing.
19           We did it without a single redaction except a
20  paragraph in a letter written by the defendant which, if the
21  jury had read, they would have been inflamed, to say the
22  least.
23           Well, I think then I will just request that it
24  be unsealed for my purposes, our purposes.
25       MS. STEVENS:  Thank you, Your Honor.

1       THE COURT:  I don't want to read it.

2               Do you have any paralegals?

3       MS. STOTTS:  I do.  She is right here next to me,

4   Melody Nelson.

5       THE COURT:  I have seen her before.  I just couldn't

6   remember whether she was your keeper or --

7       MS. STOTTS:  All of the above.

8       THE COURT:  Same thing I said about her.

9       MS. NELSON:  Thank you, Your Honor.

10      THE COURT:  So some of this will depend on what we

11  discover here.  But other than these things is the government

12  about ready?

13      MS. STOTTS:  Yes, Your Honor.

14      THE COURT:  And other than these things is the

15  defense about ready?

16      MS. STEVENS:  No, Your Honor.  No, Your Honor.  We

17  don't know what these will --

18      THE COURT:  I know that.  I said other than that.

19      MS. STEVENS:  We need the pathology slides, and

20  we're just talking about the guilt/innocence portion of

21  trial.  Then there is the penalty phase, which we haven't

22  begun discussing.

23      THE COURT:  Well, couldn't we do that afterwards?

24      MS. STOTTS:  Discuss the penalty phase?

25      THE COURT:  I'm sorry.  Do we use the same jury for

1  both?

2          MS. STOTTS:  We do, Your Honor.

3          THE COURT:  Do you need anything for the penalty

4  phase?

5          MS. STOTTS:  We do have witnesses and evidence for

6  the penalty phase.

7          THE COURT:  Can you briefly tell me what they are.

8          MS. STOTTS:  I can briefly tell you some of them.

9              Mr. Ham has allegations of misconduct with

10  females, ex-wives, possible -- I don't know what you would

11  call them, not a friend but just a person he knows.

12              There is allegations with regards to his

13  conduct as he was married and conduct in front of his

14  children that shows a propensity for cruel acts.  So we will

15  have evidence because we have --

16          THE COURT:  But we are not going to talk about

17  gossip.

18          MS. STOTTS:  No, Your Honor.  We will have the

19  witnesses here.

20          THE COURT:  But real witnesses.

21          MS. STOTTS:  Real witnesses.

22          THE COURT:  Because lots of people testify to things

23  they don't know but they think are -- they can't remember

24  why, but they didn't like him, fourth grade or something.

25          MS. STOTTS:  We will have the witnesses.

1        THE COURT:  And how much is that, half a day?

2        MS. STOTTS:  Maybe a half a day to a full day,

3   certainly.  Don't hold me to that a hundred percent.

4        THE COURT:  No.  I will allow you to make it shorter

5   any time.

6            Ms. Stevens, you don't have to tell me what you

7   have, but how much do you have?

8        MS. STEVENS:  Your Honor, we aren't ready for that

9   question yet.  And I say that because there is a lot of

10  complicated things that have to happen to get ready for the

11  trial.  So we have to decide whether we are going to put on a

12  mental health defense at the guilt phase or not, and there is

13  a process under Rule 12.2 for giving notice of that fact.

14  If we do give notice of a mental health defense, that

15  triggers filings likely by the government where they may wish

16  to evaluate the client.

17            Also --

18        THE COURT:  Wait.  My question is how much of the

19  lifestyle character kind of stuff, if we get there, do you

20  estimate you would have?  I just want a hours estimate.

21        MS. STEVENS:  In trying to predict the nature of our

22  defense, I would estimate a penalty phase would last two to

23  three weeks.

24        THE COURT:  No, it won't.  The relevant testimony

25  cannot take that long.

1          MS. STEVENS:  And again, Your Honor, it depends upon

2     the nature and the extent of mental health testimony, which

3     we are not prepared at this moment to divulge.

4          THE COURT:  Mental health testimony boils down to

5     some records, like school misbehavior and stuff like that.

6     And whatever a qualified psychologist is capable of opining

7     about, if he made bad grades in school, got into fights in

8     school, beaten by his mother, that can't be two weeks.

9          MS. STEVENS:  Your Honor, that's fairly typical for

10    a capital defense.

11         THE COURT:  Ma'am, I did my best even with this case

12    to keep it from being typical; but now as we enter into the

13    14th year, typicality is not a reason, and we don't need it.

14    People identify who they are, they identify the circumstances

15    under which they knew him and what occasions they

16    participated in that made them think X.

17         MS. STEVENS:  Your Honor, when the government seeks

18    to take a life, the issues are complicated.  We will have to

19    rebut whatever aggravating evidence they choose to put on.

20    They have alleged future danger.  They have alleged things

21    like the Court has seen in the notice of intent about

22    allegations for --

23         THE COURT:  They allege the rule part.

24         MS. STEVENS:  -- animal cruelty or things about

25    setting fires, and we will be litigating the relevance of all

1 of that.

2           THE COURT:  I don't think I am going to let the

3 government put animal cruelty in there.

4           MS. STEVENS:  We will be moving to strike a lot of

5 that, Your Honor.  There will be pretrial motions.

6           THE COURT:  Just a minute.  I just don't think --

7 you're talking about a grown man, grown woman, a gun, fire

8 ex-wives, future ex-wives, friends, enemies, if he doesn't

9 like kittens.  You have somebody that says that that

10 generalizes?

11           MS. STOTTS:  We have animal cruelty, Your Honor.  We

12 do intend to put a short portion of that on.

13           THE COURT:  All right.  But if you have a qualified

14 professional that says he can generalize from adolescence

15 animal cruelties to murder?

16           MS. STOTTS:  It wasn't adolescent, Your Honor.

17           THE COURT:  Preschool?

18           MS. STOTTS:  No.  Older.

19           THE COURT:  Okay.

20           MS. STEVENS:  So there will be litigation about the

21 validity of the evidence that they're trying to put on in

22 support of their call for death, and there is lay witness and

23 mental health witness; and we haven't determined the nature

24 yet, because we're working on it, of our mental health

25 defense, either at the guilt phase, at the second phase or in

1   straight mitigation, Your Honor.

2           And we had early on proposed a schedule of
3   events that it would take to get this case to trial, and it's
4   complicated.  There is the jury questionnaires that need to
5   be distributed, motions filing deadline, mental health notice
6   deadlines which may trigger a government request to evaluate
7   the client.  I don't --

8           THE COURT:  When do you think you can decide?  Do
9   you need a deadline?

10          MS. STEVENS:  To decide, first we need all of the
11  discovery.  Before we can make reasonable tactical decisions
12  about trial, we need all the discovery.

13          THE COURT:  You are going to get all the additional
14  Butner information.

15          What information do you not have?

16          MS. STEVENS:  The pathology slides, and we just
17  learned the --

18          THE COURT:  That's not mental health.

19          MS. STEVENS:  Oh, I was talking about the guilt
20  phase, Your Honor.

21          THE COURT:  I said mental health.  What other mental
22  health do you need before you can tell me we are going to put
23  on a mental health defense?

24          MS. STEVENS:  Sure.  Our experts need time to speak
25  to lay witnesses, read records and tell us what their

1   conclusions are about him.  That takes time.

2          THE COURT:  And what kind of qualifications do these

3   people have?

4          MS. STEVENS:  Your Honor, if we are going to get

5   into our defense for the penalty phase of a capital trial,

6   respectfully I need them to leave.

7          THE COURT:  No.  I just want to know.  Are you going

8   to use a shaman, are you going to use a shrink or a priest?

9   You would be surprised who is offered as a technical witness.

10  And sometimes I don't let them use those people as that.

11         MS. STEVENS:  Your Honor, we are not using a shaman

12  or a priest, but we do expect to bring the Court the most

13  qualified individuals we can find in their respective fields;

14  but I can't name those fields in the presence of the

15  government.  But they are fields that the Court, I would

16  assume, is used to working with.  Nothing is non traditional

17  that we are talking about here.

18         THE COURT:  I want them to be scientifically

19  reliable.  That would make them non traditional in a lot of

20  fields.

21         MS. STEVENS:  As do we.  And we are in the process

22  of identifying and working with those folks.

23         THE COURT:  All right.  Well, let's get this, what

24  we've discussed today; and I will do a written order on a

25  couple of those things, but what I said here is binding.

1          MS. STOTTS:  Yes, Your Honor.

2          THE COURT:  And I will do the specifics because I am

3     going to think about them.

4               And then you get that order and figure out a

5     schedule that you think you could handle for what you need to

6     do next.

7               And I assume you are not going to do anything

8     about mental health until you find out if they are?

9          MS. STOTTS:  Correct, Your Honor.

10          THE COURT:  So --

11          MS. STOTTS:  There is nothing we can do until we

12     find that out.

13          THE COURT:  So do identify a couple of

14     scientifically reliable people for me so that they will know

15     it may be coming.

16          MS. STOTTS:  Yes, Your Honor.

17          THE COURT:  And anything else the government needs

18     to do other than what I said?

19          MS. STOTTS:  No, Your Honor.

20          THE COURT:  All right.  So look at this stuff, get

21     started on the other things.

22               Could you decide whether to have a mental

23     health plea by August 1st?

24          MS. STEVENS:  September 1st, Your Honor?  We have

25     some just getting started, which is why I asked for time.

1      THE COURT:  Sure.  It's a little late to rush, but I
2  just want it to conclude justly.  And until then there is
3  nothing else for them to do unless the stuff you get from the
4  government will reveal other problems, in which case we will
5  get together.
6      MS. STEVENS:  If I may return to the guilt phase,
7  the forensics evidence, we do still need the pathology
8  findings.
9      THE COURT:  I said that.
10     MS. STEVENS:  Yes, Your Honor.
11         And a second issue, the DNA evidence, the raw
12  data that we had requested has been destroyed, and so we will
13  be filing a motion about that.
14     THE COURT:  Well, I can't recreate it.
15     MS. STEVENS:  I know.  You cannot, Your Honor.  So
16  we'll be filing a motion with regard to the DNA evidence.
17     THE COURT:  Okay.  If something develops that's
18  going to further complicate or, one can always hope, simplify
19  it, please let me know.
20     MS. STOTTS:  Yes, Your Honor.  Thank you.
21     MS. STEVENS:  Yes, Your Honor.  Thank you.
22     THE COURT:  Is there anybody else who ought to be
23  asked if they have a contribution?
24     MS. STOTTS:  Not at this time.
25     MS. STEVENS:  No.  Thank you, Your Honor.

1          THE COURT:  Thank you, ma'am.

2          MS. STOTTS:  Thank you, Your Honor.

3          THE COURT:  Thank you, ma'am.

4          MS. STEVENS:  Thank you, Your Honor.

5

6

7               (Conclusion of proceedings)

CERTIFICATION

I, Fred Warner, Official Court Reporter for the United States District Court for the Southern District of Texas, Houston Division, do hereby certify that the foregoing pages 1 through 48 are a true and correct transcript of the proceedings had in the above-styled and numbered cause before the Honorable LYNN N. HUGHES, United States District Judge, on the 19th day of June, 2019.

WITNESS MY OFFICIAL HAND at my office in Houston, Harris County, Texas on this the 14th day of July, A.D., 2019.

/s/ Fred Warner
Fred Warner, CSR
Official Court Reporter