# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE SPECIAL PROCEEDINGS | ) ) ) | Misc. No. 09-0198 (EGS) |

Report to Hon. Emmet G. Sullivan of Investigation Conducted
Pursuant to the Court's Order, dated April 7, 2009

Henry F. Schuelke III
Special Counsel
D.C. Bar no. 91579

William Shields
D.C. Bar no. 451036
Janis, Schuelke & Wechsler

Washington, D.C.
Dated: November 14, 2011

# TABLE OF CONTENTS

Executive Summary.......................................................................................1

Introduction................................................................................................32

Summary of Findings..................................................................................37

The Polar Pen Investigation........................................................................39

Indictment, Arraignment and Senator Stevens's
Demand for a Speedy Trial........................................................................46

Pre-Trial Discovery and the Court's *Brady* and *Giglio*
Disclosure Orders.......................................................................................50

The Prosecutors did not Conduct or Supervise the Review
     for *Brady* Material..............................................................................64
a.    FBI and IRS Agents conducted the pre-trial *Brady* review...............64
b.    The prosecutors did not supervise the *Brady* review and
     employed other PIN prosecutors, not assigned to *Stevens*
     or to the Polar Pen investigation, to conduct *Brady* reviews..............74

Pre-trial Discovery: Jencks Act Material and Electronic Discovery...........98
a.    Decision not to treat FBI 302s as Jencks Act material......................98
b.    There is evidence that the government manipulated
     the electronic discovery in an attempt to make
     Williams & Connolly's review more difficult.................................103

Statement of Investigative Findings...........................................................106
A.    Rocky Williams
     Summary...........................................................................................106
     Background.......................................................................................108
1.    Trial Preparation Interviews in Alaska, August 2008......................111
<u>August 15</u>:  Mr. Williams is "very focused and his recall is good";
     No 302 is written...............................................................................111

August 20:    Mr. Goeke's notes reflect that Mr. Williams stated
              that his time and David Anderson's time on the
              renovation of Senator Stevens's home were supposed
              to be added to the Christensen Builders' bills, and
              Mr. Bottini's notes reflect the opposite;
              No 302 is written...................................................113

August 22:
a.    Mr. Bottini and Mr. Goeke receive an email message from
      Mr. E. Sullivan regarding documents received from
      Williams & Connolly which make it "fairly apparent" that
      the defense will be that "VECO costs were rolled into
      the large Christensen bills" and that "they [will] try
      to squeeze this point out of Rocky on cross"....................................127

b.    Mr. Bottini and Mr. Goeke interview Mr. Williams
      the same day and their notes reflect that he told them
      again that VECO expenses were supposed to be added
      to the Christensen Builders' bills....................................130

c.    Mr. Goeke and/or Mr. Bottini dictate a 302 to Agent Joy
      which omits the *Brady* information provided by Mr. Williams.......150

August 31:    Mr Williams reiterates that VECO expenses were
              supposed to be included in Christensen Builders' bills;
              No 302 is written...................................................169

2.    Prosecutors Anticipated since April 2007, that Senator Stevens's
      Defense Would Be that He and His Wife Believed that VECO's
      Costs were Included in the Christensen Builders' Bills..................170

3.    On the Eve of Trial, Prosecutors Decide not to Call
      Mr. Williams as a Witness and He Returns to Alaska
      for Medical Attention.......................................................177

      a.    Trial Preparation Interviews in Washington, Sept. 2008
      September 20:    Mr. Williams reiterates that VECO expenses
                       were to be included in Christensen Builders'
                       bills.............................................................177

      September 21:    Mock cross-examination of Mr. Williams.........180

b.      Mr. Williams Returned to Alaska and Never
Testified at Trial................................................................188

4.      *In absentia*, Rocky Williams Remained a Key Figure
Throughout the Trial........................................................193

B.      Bambi Tyree..........................................................................198
Summary...............................................................................198

1. July 2004          Interview of Bambi Tyree by Agent Eckstein and
AUSA Frank Russo, and AUSA Russo's and
Mr. Goeke's Motion *in limine* in
*United States v. Boehm*...............................................199

2. March 2007        Mr. Goeke Raises a *Franks* Disclosure Issue
Regarding Mr. Allen's Solicitation of
Ms. Tyree's False Statement; Mr. Allen is interviewed
and Agent Kepner writes a one-sentence 302
that he "never encouraged others to make a false
statement under oath": No Disclosure...........................203

3. Sept. 2007        *Unites States v. Kott*, Mid-trial Sealed Proceeding:
No Disclosure................................................................205

4. October 2007      After the *Kott* Trial and Before the *Kohring* Trial,
Mr. Goeke Obtains Agent Eckstein's 302 and the
Handwritten Notes of Agent Eckstein and AUSA
Russo, Ms. Tyree is Reinterviewed and DOJ's
Professional Responsibility Advisory Office
("PRAO") is Consulted: No Disclosure.......................212

a.      Agent Eckstein's notes and 302, and
AUSA Russo's Notes.............................................212

b.      Oct. 10, 2007        Mr. Bottini and Agent Kepner interview
Ms. Tyree and the four-sentence 302
states that she "came up with an idea
to sign a document to prevent further
extortions [of Mr. Allen] . . . The content
of the document was created solely by
TYREE with the help of the attorney
[for Mr. Allen]."......................................220

c. Oct. 12, 2007 First of Two PRAO Consultations...........225

5. Oct. 25, 2007 *United States v. Kohring*, Sealed Proceeding:
No Disclosure...............................................................235

6. Dec. 20, 2007 After the *Kohring* trial, Second PRAO Consultation:
No Disclosure...............................................................237
a. PRAO's Advice is Again Based on Inaccurate and
Incomplete Information............................................237
b. Significant Factual Errors in PRAO's Report:
Not Detected or Corrected.......................................243
c. Post PRAO, Disclosure Discussions "Die on the Vine"........252

7. *Kott* and *Kohring* Postscript, Ninth Circuit, 2009-2010:
Some Disclosure...................................................................256

8. April 11, 2008 Prosecution Memo in *Stevens*: No Disclosure............263

9. July 14, 2008 Prosecutors Meet with AAG M. Friedrich: Accounts
Differ on Disclosures Made to the AAG......................265

10. August 14, 2008 Sealed Government Motion *in Limine*
to Limit Cross-Examination of Mr. Allen:
No Disclosure....................................................270
a. "rumored procurement of the false statement
from Bambi by Bill"............................................272
b. "rumor that the [government] played some role in
an earlier investigation of Allen being suspended"...............275
c. "rumored personal vices such as excessive alcohol
consumption".....................................................281
d. Sealed Hearing and Rulings on Government's
Motions: *Kott* and *Kohring* Hearings Redux........................282

11. August 25, 2008 Government's *Giglio* Letter: No Disclosure......286
a. Drafts: Some Disclosure.......................................286
b. Final: No Disclosure...........................................289

12. Sept. 9, 2008    Government's *Brady* Letter: No Disclosure,
Misrepresentations and Omissions..............................299

    a.    Documents evidencing Mr. Allen's subornation of
perjury circulated among the prosecutors as they
drafted the *Brady* letter.........................................300
        i.    Agent Eckstein's 302 and notes..................300
        ii.    AUSA Russo's and AUSA Goeke's
pleadings in *Boehm*......................................308
        iii.    PRAO opinions.............................................312
    b.    Prosecutors re-interview Mr. Allen and obtain more
denials and self-serving statements.......................313
    c.    None of the drafts of the *Brady* letter disclosed Agent
Eckstein's 302, the government's pleadings in *Boehm*,
or the information contained in those documents.................316
        i.    Initial drafts disclose additional allegations
of sexual misconduct by Mr. Allen but no
information about his subornation of perjury..............316
        ii.    Mr. Welch, Ms. Morris, Mr. Marsh and
Mr. E. Sullivan meet and determine
the *Brady* disclosure regarding Mr. Allen
and Ms. Tyree...............................................321
    d.    Final draft: written by Mr. Marsh, approved
by Mr. Goeke, and "skimmed" by Mr. Bottini,
with Mr. E. Sullivan as "scrivener".......................329
    e.    Oct. 14-16, 2008: Mr. Welch discovered Agent
Eckstein's 302 in the APD file, read it for the first
time and provided it to Williams & Connolly.......................344

13. Sept. 30-Oct. 7, 2008    Mr. Allen was not questioned at
trial about Ms. Tyree or the APD
investigations...........................................351

C.  The Torricelli Note, the Interviews of Mr. Allen
    on April 15 & 18 and Sept. 9 & 14, 2008, and
    Mr. Allen's CYA Testimony..............................................351

    Summary...........................................................................351

1.  April 2007-March 2008  Prosecutors believe that Senator
                           Stevens's oral requests for invoices
                           from Mr. Allen are "pretextual" and
                           that "ALLEN has stated as much"...........354

2.  April 8, 2008          Prosecutors receive the Torricelli note
                           from Williams & Connolly.................356

3.  April 11, 2008         Torricelli notes featured in memorandum
                           to AAG Fisher, "troubling irregularities"
                           identified................................359

4.  April 15, 2008         Mr. Allen tells Mr. Bottini, Mr. Goeke,
                           Mr. Marsh, Mr. E. Sullivan and
                           Agent Kepner that he does not remember
                           speaking with Bob Persons about
                           the Torricelli note, interview notes are
                           taken, but no 302 is written because "the
                           debriefing … did not go well"............362

5.  April 15 & 18, 2008    The Value of VECO's Work on
                           Senator Stevens's Home..................380
    a.  Mr. Allen told Mr. Bottini, Mr. Goeke, Mr. Marsh and
        Agent Kepner that the value of VECO's work on Senator
        Stevens's home was approximately $80,000 and not
        $250,000, the amount later alleged in the indictment...........380
    b.  Although the prosecutors anticipated that Senator
        Stevens would assert as part of his defense that
        "the $250K value of VECO's work is over-inflated",
        they never disclosed Mr. Allen's statements that the
        value of VECO's work was $80,000......................387

    c.    The value of VECO's work and the cost of the
renovation were significant, contested issues
throughout the trial...............................................................394
        i.    Opening statements.......................................................394
        ii.   Mr. Allen's Testimony, the Pluta 302 and the
Redaction of VECO's Cost Report (GX 177).............395
        iii.  Summations.............................................................. 399

6.    April 24, 2008:    William Arthur, Senator Stevens's archivist,
is interviewed......................................................401

7.    May 1, 2008    Prosecutors interview Barbara Flanders,
Senator Stevens's assistant, who exchanged
emails with Senator Stevens in December
2002 about Bob Persons "riding herd"
on getting bills for the work on the
Girdwood residence; no 302 is written.............402

8.    May 8, 2008    Bob Persons is interviewed, but not about
the Torricelli note...............................................410

9.    May 15, 2008    A revised prosecution memo addresses the
Torricelli notes, the emails between
Ms. Flanders and Senator Stevens, and
Senator Stevens's "cover story".........................414

10.   July 25, 2008    During its next to last meeting before voting
to indict, the grand jury hears testimony about
the Torricelli note and Senator Stevens's
request to Mr. Allen for a boiler repair bill
in 2006 because "it fits TS's m.o. of asking
for invoices from BA only when it looks
like he can't hide it"...........................................417

11.   Sept. 9, 2008    As the *Brady* letter is drafted, Mr. Allen is
questioned again about Senator Stevens's
requests for bills and why none was sent...........420

12.  Sept. 14, 2008      Mr. Allen is questioned again about the
                         Torricelli note and remembers his CYA
                         conversation with Mr. Persons in 2002; Mr.
                         Bottini, Mr. Goeke, Mr. E. Sullivan,
                         Mr. Marsh and Agent Kepner forget their
                         interview of Mr. Allen in April, 2008,
                         Ms. Morris remembers it, and no one
                         checks their notes...............................................424

13.  Sept. 25, 2008     Brendan Sullivan features the Torricelli note
                        prominently in his opening statement...............462

14.  Oct. 1, 2008       On direct, Mr. Allen testifies that Mr. Persons
                        told him in 2002 that "Ted is just covering
                        his ass" with the Torricelli note........................463

15.  Oct. 6, 2008       On cross, Mr. Allen testifies that he did not
                        tell the government "just recently" about his
                        CYA conversation with Mr. Persons and the
                        prosecutors do not correct his false
                        testimony.............................................................469

Discussion and Conclusion........................................................................497
1.   Favorable Evidence was Concealed From Senator Stevens
     which would have Directly Corroborated His Defense and
     Significantly Impeached the Credibility of the Government's
     Key Witness.....................................................................................497
     a.   *Brady* and *Giglio*..................................................................497
     b.   *Napue*.....................................................................................503

2.   The Essential Elements of Criminal Contempt..................................507

| **Addendum** | **Subject Attorneys' Comments and/or Objections to the Report Pursuant to the Court's Order, dated February 8, 2012** |
|---|---|
| Exhibit 1 | Joseph W. Bottini |
| Exhibit 2 | James A. Goeke |
| Exhibit 3 | Nicholas A. Marsh |
| Exhibit 4 | Brenda K. Morris |
| Exhibit 5 | Edward P. Sullivan |
| Exhibit 6 | William M. Welch III |

## Executive Summary

The investigation and prosecution of U.S. Senator Ted Stevens were permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated Senator Stevens's defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness. Months after the trial, when a new team of prosecutors discovered, in short order, *some* of the exculpatory information that had been withheld, the Department of Justice ("DOJ") moved to set aside the verdict and to dismiss the indictment with prejudice. New prosecutors were assigned after U.S. District Judge Emmet G. Sullivan held two of the previous prosecutors in contempt for failing to comply with the Court's order to disclose information to Senator Stevens's attorneys and to the Court regarding allegations of prosecutorial misconduct which were made after trial by an FBI agent who had worked on the case.

Judge Sullivan granted the government's motion and dismissed the indictment with prejudice on April 7, 2009, finding that "There was never a judgment of conviction in this case. The jury's verdict is being set aside and has no legal effect." On the same day, Judge Sullivan appointed Henry F. Schuelke III, the undersigned, "to investigate and prosecute such criminal contempt proceedings as may be appropriate" against the six prosecutors who conducted the investigation and trial of Senator Stevens. The investigation lasted two years and required the examination and analysis of well over 128,000 pages of documents, including the trial record, prosecutors' and agents' emails, FBI 302s and handwritten notes, and depositions of prosecutors, agents and others involved in the investigation and trial.

As a direct consequence of the dismissal of the indictment against Senator Stevens, the convictions of Peter Kott and Victor Kohring, Alaskan state legislators, were reversed and new trials ordered because significant exculpatory information in those cases was concealed from the defense, including the same impeachment information about the same government key witness which had been concealed from Senator Stevens. *See United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011); *United States v. Kott*, 423 Fed. Appx. 736 (9th Cir. 2011). The Court of Appeals rejected the government's argument that the prosecutors' "discovery missteps" were harmless and that Mr. Kott and Mr. Kohring had nevertheless received fair trials.

The seven-count, false statements indictment filed against Senator Stevens on July 29, 2008 alleged that, during the period from May 1999 to August 2007, he received benefits and other things of value from VECO Corporation, Bill Allen, VECO's chief executive officer and principal owner, and two other individuals. By far the largest and most significant benefit allegedly received was more than $250,000 worth of renovation and repair work performed in 2000 to 2002 by VECO on a house in Girdwood, Alaska, which was owned, and occasionally used, by Senator Stevens and his wife, Catherine Stevens; their primary residence was in Washington, D.C. Mr. Allen, a friend of Senator Stevens, arranged for work to be performed by VECO employees, including David Anderson (Mr. Allen's nephew) and Robert "Rocky" Williams, who supervised the VECO employees. Rocky Williams also supervised Christensen Builders, a contracting company which was hired and paid by Senator Stevens and Catherine Stevens to perform the renovations. The indictment alleged that Senator Stevens concealed his receipt of free renovation and repair services provided by VECO's employees, and violated the false statements statute, 18 U.S.C. § 1001, by failing to disclose them on Financial Disclosure Forms which he filed annually with the Senate.

In 2003, the government began a large-scale investigation into public corruption in Alaska state politics known as the Polar Pen investigation. Mr. Allen began cooperating with DOJ's "Polar Pen" investigation of official corruption in Alaska on Aug. 30, 2006, and pursuant to a plea and cooperation agreement with the government, testified as the government's key witness against Mr. Kott and Mr. Kohring in 2007 and against Senator Stevens in 2008. Rocky Williams, the foreman of the Girdwood renovation and "Bill [Allen]'s eyes", was expected to be an important government witness against Senator Stevens, but the prosecutors returned him to Alaska for medical attention on the day opening statements were given. He never returned to testify and died in Alaska on December 30, 2008.

Senator Stevens was arraigned on July 31, 2008, and his attorney, Brendan Sullivan, requested an October trial date so that Senator Stevens, who was running for re-election, could clear his name before the November election. Brenda Morris, the lead prosecutor, acceded to the request and suggested an earlier trial date, Sept. 24, 2008, which was accepted by the Court and Mr. Sullivan. That date was later advanced and jury selection began on Sept. 22, 2008. The prosecutors had anticipated the possibility of a speedy trial request by the defense, decided in advance to consent if one was made, but they were unprepared for a speedy trial.

During the arraignment, Ms. Morris agreed to expedited discovery and informed the Court that the "the bulk" of the government's discovery would be provided to Williams & Connolly, Senator Stevens's lawyers, the following week. That didn't happen. Rule 16 discovery was delayed for weeks while files and electronic data were transferred from the offices of the U.S. Attorney and FBI in Anchorage, Alaska (where the government's investigation was based), to Washington, D.C. The government's review of its files for *Brady/Giglio* material had only begun on or around the date the indictment was filed.[1] That review was "completed" on Sept. 9, 2008, less than two weeks before jury selection began, when the prosecutors made their second and last voluntary disclosure of *Brady* information to the defense.

But the prosecutors never conducted or supervised a comprehensive and effective review for exculpatory information. The review of the government's files for *Brady* information was conducted by FBI and IRS agents, some of whom were unfamiliar with the facts or with Brady/Giglio requirements, unassisted and unsupervised by the prosecutors. The prosecutors also failed to review their own notes of witness interviews, including notes of their interviews of Mr. Allen which contained significant *Brady* information that was never disclosed to the defense.

Not only was the *Brady* review unsupervised, the prosecutors themselves were unsupervised. At the request of Matthew Friedrich, the Assistant Attorney General for the Criminal Division, Ms. Morris, the Principal Deputy Chief of DOJ's Public Integrity Section ("PIN"), became the lead prosecutor a few days before the indictment was filed. Joseph Bottini, an AUSA in the Alaska U.S. Attorney's Office, and Nicholas Marsh, a PIN attorney, became second and third chairs respectively. James Goeke, an Alaskan AUSA, and Edward Sullivan, a PIN attorney, who had both worked on the Polar Pen investigation for years and had participated in the trials of Mr. Kott and Mr. Kohring in 2007, were removed from the in-court trial team and performed back office work during the trial. Ms. Morris had intermittently supervised the Polar Pen investigation and had a general, but not a detailed knowledge of the years-long investigation of Senator Stevens. Her four displaced colleagues resented her appointment, and Ms. Morris, in an attempt to avoid making the situation worse, "tr[ied] to make herself as little as possible", and did not supervise the prosecution.

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

Ms. Morris developed a direct reporting relationship with A.A.G. Friedrich and Rita Glavin, his Principal Deputy, which interfered with the ability of William Welch, the Chief of PIN, to supervise Ms. Morris and the conduct of the prosecution, including the government's approach to pre-trial discovery. For example, during a meeting with Mr. Friedrich, Ms. Glavin and Mr. Welch, Ms. Morris recommended, without prior consultation with Mr. Welch, that FBI 302s of witness interviews not be disclosed as Jencks Act (18 U.S.C. § 3500) material, a position contrary to Mr. Welch's preferred practice. Mr. Friedrich and Ms. Glavin endorsed Ms. Morris's recommendation and 302s were not disclosed to the defense until a week before trial when, on Sept. 16, 2008 and in response to Senator Stevens' motion to compel, Judge Sullivan ordered the government to disclose all 302s containing *Brady* information the next day. The prosecutors delivered 302s to the defense with all non-*Brady* information redacted.

Mr. Allen took the witness stand on Sept. 30, 2008. Near midnight on October 1, 2008, Ms. Morris informed the Court and Williams & Connolly that *Brady* information had been inadvertently redacted from a 302 of an interview of Mr. Allen. The next day, October 2, Judge Sullivan suspended Mr. Allen's direct testimony and ordered the prosecutors to disclose "forthwith" unredacted 302s and grand jury testimony for all their witnesses. The resulting mid-trial disclosure of the grand jury testimony of David Anderson led to the immediate discovery by Williams & Connolly of more undisclosed *Brady* material which significantly contradicted VECO business records, already admitted into evidence, which purported to detail the value of the work performed by VECO's employees on the Girdwood residence.

Despite Judge Sullivan's orders on Sept. 16 and Oct. 2, 2008, the prosecutors never disclosed all the 302s for their witnesses or all the *Brady* information in their possession. But had the prosecutors disclosed every 302 in the case, they would still not have fulfilled their *Brady* obligation. FBI Agent Mary Beth Kepner, the case agent for the Polar Pen investigation and Mr. Allen's handler, did not write 302s for all interviews of Mr. Allen. Handwritten notes taken by the prosecutors, Agent Kepner and Agent Chad Joy during interviews of Mr. Allen and Rocky Williams contained significant exculpatory information which was not contained in any 302 and was never disclosed to Senator Stevens's attorneys.

4

Opening statements were given on Sept. 25, 2008. Ms. Morris told the jury that VECO kept track of its costs on the renovation, $188,000, "down to the penny", but admitted in the same breath that this figure could be "little high" or a "little low":

> whether it's $188,000 or whether it's $240,000 or whether it's $120,000, the defendant still got it for nothing. He had to disclose it, was obligated to disclose it, but instead he chose not to.

> *United States v. Stevens*, Trial Transcript, Sept. 25, 2008 A.M., at 42.

In his opening, Brendan Sullivan explained that Senator Stevens did not file intentionally false Financial Disclosure Forms because he and his wife believed that they had paid for the entire cost of the renovation in their payments to Christensen Builders and that, to their knowledge, they had not received any free services or benefits from Mr. Allen or VECO. Using personal funds and a mortgage loan of $100,000, they paid $160,000 for the renovation, including over $130,000 to Christensen Builders, a contractor recommended to them by Mr. Allen. Mr. Sullivan also told the jury that Rocky Williams and Mr. Allen reviewed the Christensen Builders' bills before they were sent to the Stevenses and that Senator Stevens and his wife paid the Christensen bills in full, with the understanding and belief that those payments covered the entire cost of the renovation, including any services provided by VECO's employees.

Mr. Sullivan was not aware when he gave his opening statement, and never learned during or after the trial, that the prosecutors possessed evidence that directly corroborated Senator Stevens's defense. At trial, Senator Stevens and his wife were the only witnesses who testified that the Christensen Builders' bills included any VECO charges for the renovation. The prosecutors never disclosed that Rocky Williams, the foreman of the renovation who reported directly to Mr. Allen, had the same understanding and belief as Senator Stevens and his wife, that VECO's costs for its employees' work on the renovation were included in the Christensen Builders' bills.

5

**Rocky Williams**

Mr. Williams was interviewed for trial preparation purposes by Mr. Bottini, Mr. Marsh, Mr. Goeke, FBI Agents Kepner, Joy and Craig Howland on August 20, 2008, by Mr. Bottini, Mr. Goeke and Agent Joy on August 22 and 31, and by Mr. Bottini, Mr. Marsh and Agent Joy on September 20. According to the prosecutors' handwritten notes of those interviews, Mr. Williams repeatedly told them that after he reviewed the Christensen Builders' bills, he sent them to Mr. Allen, and that it was his belief and understanding, based on statements made by Mr. Allen and Senator Stevens, that Mr. Allen would add to the Christensen Builders' bills the charges for his time, David Anderson's time, and the time of other VECO employees who worked on the renovation.

Rocky Williams's statements corroborated a defense which the prosecutors had anticipated for over a year. A prosecution memorandum written in April, 2007, predicted that Senator Stevens might assert as a defense that he paid for all the costs of the renovation, and did not intentionally file false Financial Disclosure Forms, because he paid the Christensen Builders' bills in full believing that any VECO expenses for the renovation "were somehow rolled into [Christensen Builders'] invoices." Every subsequent prosecution memorandum identified that same defense, and in a memorandum to AAG Alice Fisher in April, 2008, the prosecutors described it as Senator Stevens's "primary defense":

> TS [Ted Stevens] thought he and CAS [Catherine A. Stevens] paid for all the work. We anticipate this to be TS' primary defense. Here, TS will say that CAS was in charge of finances; CAS paid $138K to Christensen; CAS thus thought she paid for everything in connection with the house; and thus neither TS nor CAS knew about VECO's unreimbursed contributions to the home renovation.
>
> Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, Exh. A, "Attacks", at 1 (emphasis in original).

On August 22, 2008, the same day Rocky Williams reiterated to Mr. Bottini, Mr. Goeke and Agent Joy that his understanding was that the Christensen Builders' bills included VECO's expenses, Mr. E. Sullivan informed Mr. Bottini, Mr. Goeke and the other members of the trial team that documents recently received from

6

Williams & Connolly showed that Rocky Williams's testimony on that issue would be crucial:

> … Based on the cancelled checks and the handwritten note from Rocky to CAS [Catherine A. Stevens], it's fairly apparent that "TS [Ted Stevens] will say that CAS handled the bills, CAS coordinated with Rocky, and TS didn't know VECO wasn't paid b/c CAS never told him. To further insulate TS, CAS will likely testify that Rocky told her the VECO costs were rolled into the large Christensen bills. Alternatively, if CAS doesn't testify, then they try to squeeze this point out of Rocky on cross. If they make this point, TS can then argue that CAS didn't tell him about the VECO costs b/c she thought the VECO costs were included in the Christensen bills. …

> Email from E. Sullivan, dated Aug. 22, 2008, to J. Goeke, J. Bottini, N. Marsh, B. Morris, W. Welch, Agent Kepner, Agent Joy, J. Bradison (USAAK) and K. Walker (USAAK).

None of the *Brady* information provided to the prosecutors during their four interviews of Rocky Williams in August and September, 2008, was memorialized in any FBI 302. Instead, only one, two-sentence 302 was written which was dictated to Agent Joy by Mr. Goeke and/or Mr. Bottini after the interview on August 22, 2008. The only statements by Rocky Williams reported in that 302 were two that were helpful to the prosecution and gave a misimpression of the substance of what Mr. Williams had said during the interviews:

> WILLIAMS advised he never had any conversations with TED STEVENS or CATHERINE STEVENS in which WILLIAMS made any representations that VECO expenses were placed on CHRISTIANSON [sic] BUILDERS invoices. WILLIAMS further stated that neither TED STEVENS nor CATHERINE STEVENS ever asked WILLIAMS whether any of the VECO expenses, labor or materials, were included in the CHRISTIANSON [sic] bills.

> FBI SA Chad Joy's 302 of interview of R. Williams on August 22, 2008, date of transcription, Aug. 23, 2008.

Agent Joy circulated that 302 by email to the entire prosecution team, including Mr. Bottini and Mr. Goeke, on August 23 and again on August 25 with the subject line, "Important Rocky Williams Statement".

   Three days after that interview, on August 25, Mr. Bottini wrote the government's first *Brady* letter to Williams & Connolly disclosing "potential impeachment information relating to certain potential government witnesses", Mr. Allen, Richard Smith (a VECO executive who did not testify at trial), David Anderson and Rocky Williams (misidentified in the letter as "Richard B. Williams"). Regarding Mr. Williams, Mr. Bottini provided his criminal history and added that "[t]he government is also aware of rumors concerning excessive alcohol use by Williams and it is possible that Williams may have an alcohol dependency issue." In fact, Mr. Bottini and the other prosecutors knew that Mr. Williams was an alcoholic. Mr. Bottini did not disclose in that *Brady* letter any of the information provided to him by Rocky Williams just days earlier, on August 20 and 22, which corroborated Senator's Stevens "primary defense".

   The prosecutors' second and last *Brady* letter, dated Sept. 9, 2008, also did not disclose the exculpatory information provided by Rocky Williams on August 20, 22 and 31, 2008, that he reviewed the Christensen Builders' bills and gave them to Mr. Allen to add any VECO renovation expenses. Instead, they told Williams & Connolly that Rocky Williams "did *not* deal with the expenses [of the renovation] and did *not* recall reviewing Christensen Builders invoices". Letter from B. Morris, dated Sept. 9, 2008, to A. Romain, ¶ 15 (emphasis added).

   A few days before the trial began, and after Mr. Williams did poorly on a mock cross-examination conducted by Mr. Goeke, the prosecutors determined that Mr. Williams was in poor health and needed medical attention in Alaska, and they returned him to Alaska on Sept. 25, 2008, the day opening statements were given. The prosecutors did not inform Judge Sullivan or Williams & Connolly of Mr. Williams's return to Alaska, though they knew he'd been listed as a trial witness and knew he was under a defense subpoena to testify on Oct. 6. Instead, they instructed him to call Williams & Connolly when he got back to Alaska. Williams & Connolly lawyers interviewed Mr. Williams by phone in Alaska on Sunday, Sept. 28, 2008, and he told them that he did not work full time on the renovation. This information contradicted VECO's time and billing records which the government had just introduced into evidence. Williams & Connolly filed a motion

8

to dismiss the indictment the same day and, after a hearing on Sept. 29, 2008, Judge Sullivan denied the motion and took curative measures, including the recall of VECO's records custodian for further cross-examination.

But Mr. Bottini and Mr. Goeke never disclosed, and Williams & Connolly never learned, that Rocky Williams told the prosecutors repeatedly in August and September 2008 that he had the same understanding as Senator Stevens and his wife, that VECO's expenses were supposed to be added to, and included in, the Christensen Builders' bills. Mr. Bottini, a career prosecutor with the Department of Justice since 1985, testified in this investigation that, despite the fact that prosecution memos in 2007 and 2008, and Mr. E. Sullivan's email on Aug. 22, 2008 identified that defense, it never "crossed [his] mind" that Rocky Williams's "assumption", that VECO expenses were included in the Christensen Builders' bills, was *Brady* information. Mr. Goeke, an AUSA since 2003, testified that he never considered whether *Brady* required its disclosure and he did not know if that information was disclosed to the defense.

### Bambi Tyree

Bambi Tyree was a child prostitute who had a sexual relationship with Mr. Allen when she was 15 years-old. In 2004, at age 23, she was indicted with Josef Boehm and others by the U.S. Attorney's Office in Alaska on drug conspiracy and child sex trafficking charges and became a cooperating witness against Mr. Boehm. AUSA Frank Russo was in charge of the prosecution, assisted by Mr. Goeke; the FBI case agent was John Eckstein. On July 22, 2004, AUSA Russo and Agent Eckstein conducted a trial preparation interview of Ms. Tyree, and the first subject they questioned her about was her relationship with Mr. Allen.

Agent Eckstein's 302 of that interview reported in its first paragraph:

TYREE had sex with BILL ALLEN when she was 15 years old. TYREE previously signed a sworn affidavit claiming she did not have sex with ALLEN. TYREE was given the affidavit by ALLEN's attorney, and she signed it at ALLEN's request. TYREE provided false information on the affidavit because she cared for ALLEN and did not want him to get into trouble with the law.

9

FBI SA John Eckstein's 302 of Interview of Bambi Tyree, dated Oct. 28, 2004, at 1 (DOJ Bates nos. CRM043377-378).

Four days later, on July 26, 2004, AUSA Russo filed a sealed motion *in limine* in *United States v. Boehm* to limit the cross-examination of Ms. Tyree. AUSA Russo stated in the motion that when Mr. Allen was blackmailed with threatened public disclosure of his sexual relationship with Ms. Tyree, he asked Ms. Tyree to sign an affidavit in which she falsely stated that she and Mr. Allen never had sex. In his sealed Reply Brief, AUSA Russo asserted that "Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action." In a sealed decision, District Judge John Sedwick granted the motion. Mr. Goeke signed the government's sealed opposition to the defendant's motion for reconsideration which described Ms. Tyree's agreement to give a statement under oath to Mr. Allen's lawyer falsely denying that she had sex with Mr. Allen. These government pleadings and Judge Sedwick's decision in *Boehm* remained under seal and inaccessible to Williams & Connolly during the investigation and trial of Senator Stevens, and they remain under seal today.[2]

In March, 2007, as prosecutors drafted an application for a warrant to search Senator Stevens's house in Alaska, which was based in large part on information provided by Mr. Allen, Mr. Goeke and Mr. Bottini became concerned that Judge Sedwick, who would review the application, might question Mr. Allen's credibility in light of AUSA Russo's disclosures in *Boehm* that Mr. Allen had suborned perjury by Ms. Tyree. Mr. Goeke and Mr. Bottini obtained copies of the *in limine* motion in *Boehm* from AUSA Russo, and Mr. Goeke emailed a summary and excerpts of the motion to Mr. E. Sullivan and Mr. Bottini. Mr. Goeke pointed out that Mr. Allen had never been questioned in the Polar Pen investigation about his relationship with Ms. Tyree and his role in her false sworn statement. A few days

---

[2]In November 2004, Mr. Boehm pled guilty to conspiracy to commit sex trafficking of children and conspiracy to distribute controlled substances to persons under 21-years old. He "specifically admitted the truth of the allegations contained in the factual basis for his pleas, including the following: Beginning in late 2001 and continuing until December 22, 2003, BOEHM conspired with BOLLING, WILLIAMS, and TYREE to recruit persons under 18 ('juveniles') to engage in sexual acts. The juveniles were recruited by offering them cocaine . . . These juveniles had sex with one or more of the defendants, and received money and/or controlled substances from the defendants." *Ditullio v. Boehm*, No. 10-36012, 2011 U.S. App. LEXIS 22510, *4-5 (9th Cir. Nov. 7, 2011).

later, Agent Kepner interviewed Mr. Allen and wrote a one-sentence 302 of his general denial: "[Mr. Allen] has never made a statement under oath that he knew was false or misleading nor has [he] encouraged others to make a false statement under oath." The prosecutors did not disclose Mr. Allen's subornation of perjury in the search warrant application signed by Agent Kepner and the issue was not raised by Judge Sedwick, who signed the warrant on July 27, 2007.[3]

Nor was any disclosure made to the attorneys for Mr. Kott during his trial in September, 2007. Mr. Goeke and Mr. Marsh were the trial prosecutors and Mr. Allen was their key witness. During a sealed hearing before Judge Sedwick, Mr. Goeke raised the issue of possible cross-examination of Mr. Allen regarding his relationship with Ms. Tyree and stated that the relationship had no relevance to the case "whatsoever". The attorneys for Mr. Kott responded that they did not know who Bambi Tyree was and questioned whether she had something to do with Mr. Allen and Mr. Boehm. Mr. Goeke and Mr. Marsh provided no additional information about Ms. Tyree and Mr. Allen to the defense attorneys or the court, and the hearing concluded with Judge Sedwick's statement that he was aware of the *Boehm* case and that there was nothing "that connects that case to this case in any way that has any relevance here."

After Mr. Kott's trial ended and before Mr. Kohring's started, Mr. Goeke obtained a copy of Agent Eckstein's 302 and notes of the interview of Ms. Tyree on July 22, 2004, which he immediately provided to Mr. Bottini and Mr. Marsh. He also obtained a copy of AUSA Russo's notes of that interview which originally reflected that Ms. Tyree signed an affidavit, falsely denying that she had sex with Mr. Allen, "at the request of Bill". However, that notation was altered, "Bill" was crossed out and "Bambi's idea" was added. AUSA Russo testified in this investigation that he remembered in 2009, that he might have made those changes in 2005, during a witness preparation session with Ms. Tyree.

Conflicting memories and accounts by, or attributed to, AUSA Russo and Agent Eckstein, led to a decision to interview Ms. Tyree about what she told them in July 2004. Mr. Bottini and Agent Kepner interviewed her on Oct. 10, 2007, and Agent Kepner's one-paragraph 302 of that interview reflects the following statement by Ms. Tyree:

---

[3]Our investigation focused on the information that was in the possession of the prosecutors. Whether Ms. Tyree had a sexual relationship with Mr. Allen when she was 15 years-old and whether Mr. Allen asked Ms. Tyree to sign a false affidavit are matters beyond the scope of our investigative mandate. Thus, references throughout this Report regarding these matters do not reflect a conclusion that such conduct occurred.

Lisa LNU (last name unknown) was extorting BILL ALLEN regarding an alleged relationship between BAMBI TYREE and ALLEN. TYREE came up with an idea to sign a document to prevent further extortions by LISA. Tyree met with an attorney in a downtown office building close to Phil Weidner's office. The content of the document was created solely by TYREE with the help of the attorney.

Agent Kepner's 302 of Interview of Bambi Tyree on Oct. 10, 2007, dated October 11, 2007 (parenthetical in original).

The prosecutors also consulted with DOJ's Professional Responsibility Advisory Office ("PRAO") about whether *Brady* required disclosure of information regarding Mr. Allen's subornation of perjury by Ms. Tyree. Mr. Marsh spoke on the telephone with PRAO attorney Ruth Plagenhoef on Oct. 12, 2007. Ms. Plagenhoef's record of her conversation with Mr. Marsh reflects that he provided her with materially inaccurate and incomplete information. In short, he told Ms. Plagenhoef that the *Brady* disclosure issue arose entirely from AUSA Russo's "possible recollection" that Ms. Tyree told him that Mr. Allen had once asked her to lie, that there was no evidence to corroborate that recollection, and that all available evidence contradicted it. Mr. Marsh did not inform Ms. Plagenhoef of the statement in the government's sealed motion *in limine* in *Boehm* that "Mr. Allen convinced Ms. Tyree to give a false statement", and he incorrectly described Agent Eckstein's 302 as "not clear, stating simply that she lied" and AUSA Russo's notes as reflecting that "Bambi denied that B[ill]A[llen] asked her to lie". Based on that and other misinformation, Ms. Plagenhoef agreed with Mr. Marsh that *Brady* did not require disclosure of AUSA Russo's recollection to the defense in *Kott* or *Kohring*.

Mr. Bottini and Mr. E. Sullivan, the trial prosecutors in *Kohring*, did not disclose any information about Mr. Allen's subornation of Ms. Tree's perjury to the defense. During a sealed hearing, Mr. Bottini questioned whether Mr. Kohring's attorney planned to cross-examine Mr. Allen about his relationship with Ms. Tyree, and the attorney, unaware of any information regarding Mr. Allen's subornation of perjury by Ms. Tyree, responded that he did not plan to question Mr. Allen about his "juvenile relationships … whether that's true or not I have no idea, and, two, it's amazingly tacky and I would not do that." Judge Sedwick agreed that "it would [not] advance Mr. Kohring's interests in any event."

12

After Mr. Kohring's trial, the prosecutors learned that a newspaper planned to publish an article about Mr. Allen's relationship with Ms. Tyree and his gifts to her and her family, and they consulted with PRAO again. Mr. Marsh spoke with another PRAO attorney, Patricia Weiss, on December 20, 2007, and he again provided PRAO with incomplete, inaccurate and misleading information. Ms. Weiss's report of her conversation with Mr. Marsh contains no indication that he disclosed the statements in AUSA Russo's *in limine* motion or the contents of Agent Eckstein's 302 or notes. Ms. Weiss concluded that the upcoming news story about Mr. Allen's gifts to Ms. Tyree and her family did not cause her to change the advice given by PRAO in October 2007, that disclosure of AUSA Russo's "recollection" was not required where the prosecutors had conducted an investigation and found "no evidence to support the notion that [Mr. Allen] had pressed [Ms. Tyree] to lie".

On December 21, 2007, Ms. Weiss sent an email to Mr. Marsh and Mr. E. Sullivan which recapitulated the advice she gave Mr. Marsh during their telephone conversation, the information he provided to her, and the information which he provided to Ms. Plagenhoef on Oct. 12, 2007. The factual errors, misstatements and omissions in that email are evident to anyone familiar with AUSA Russo's *in limine* motion in *Boehm*, his notes of the interview of Ms. Tyree on July 22, 2004, and Agent Eckstein's 302 and notes of that interview. Mr. Marsh forwarded Ms. Weiss's email to Mr. Bottini and Mr. Goeke on Jan. 3, 2008. No one notified PRAO of any errors or omissions in that email.

The prosecutors never disclosed any information about Mr. Allen's subornation of perjury to Williams & Connolly, except to deny it ever happened. Mr. Bottini drafted a sealed motion *in limine*, dated Aug. 14, 2008, which disclosed that Mr. Allen had been investigated twice by the Anchorage Police Department ("APD") about a sexual relationship with "a juvenile female [Ms. Tyree] approximately ten years ago." In an earlier email to his colleagues, Mr. Bottini stated that he and Mr. Goeke discussed keeping the motion "pretty basic (i.e. no detailed info set out here re: Bambi allegations and rumors) to smoke out how much they [Williams & Connolly] know". Email from J. Bottini, dated August 10, 2008, to W. Welch, N. Marsh, B. Morris, E. Sullivan and J. Goeke. The sealed motion sought to preclude cross-examination of Mr. Allen about his relationship with Ms. Tyree because "allegations of sexual misconduct … are unrelated to a witness' character for truthfulness." Mr. Bottini pointed out in a footnote that the

13

same issue had been addressed in sealed hearings in *Kott* and *Kohring* and that in both cases the defense lawyers informed the court that they would not question Mr. Allen about his sexual relationship with Ms. Tyree.

At the Court's suggestion, the government withdrew its sealed motion *in limine* without prejudice on Sept. 5, 2008. In a ruling just before Mr. Allen began his testimony, Judge Sullivan allowed cross-examination about the APD investigations of Mr. Allen on the condition that the nature of the underlying offense not be disclosed. The Court found that, with that limitation, the investigations were "a fertile ground for inquiry about the witness' state of mind and what he would like the government to do in an effort to curry favor. I think that goes to his bias, his motivation to speak the truth or not." *United States v. Stevens*, Trial Transcript, Sept. 30, 2008 P.M., at 46-47.

On August. 25, 2008, Mr. Bottini sent Williams & Connolly the first *Brady* disclosure letter which stated that the government learned on Aug. 22, 2008, that there was another, pending APD investigation of Mr. Allen regarding allegations that he "engaged in a sexual relationship with a different juvenile female." Mr. Bottini also disclosed that the government "has learned that Allen has provided financial benefits to the individual who was the subject of the earlier investigation [Ms. Tyree] as well as to family members of the subject. … [and] to the subject of the pending investigation." Following the disclosures on August 14 and 25, 2008, Williams & Connolly made repeated requests for additional information about the APD investigations and the financial benefits provided by Mr. Allen to the "juvenile females". The prosecutors refused to provide any additional information until Sept. 9, 2008 when they made their last voluntary *Brady* disclosure.[4]

---

[4]By letters dated August 15 and 18, 2008, Williams & Connolly requested further information about Mr. Allen's sexual misconduct, personal vices and the APD investigation which were disclosed in Mr. Bottini's motion *in limine*. Mr. E. Sullivan rejected the request. Letter from E. Sullivan, dated Aug. 18, 2008, to A. Romain, at 3 (*United States v. Stevens*, Dkt. No. 63-1).

On August 21, 2008, Williams & Connolly requested all *Brady* and *Giglio* information regarding the APD investigation. Ms. Morris acknowledge the government's *Brady* and *Giglio* obligations but provided no information. Letter from B. Morris, dated Aug. 21, 2008, to R. Cary (DOJ Bates no. CRM035004).

On Sept. 5, 2008, Williams & Connolly requested details of the financial benefits provided by Mr. Allen to the two juvenile females referred to in Mr. Bottini's August 25-*Brady* letter. Ms. Morris provided no information and again recited that the government was aware of

On Sept. 9, 2008, the prosecutors sent Williams & Connolly their second and last *Brady* disclosure letter. Mr. Marsh, assisted by Mr. Bottini, Mr. Goeke and Mr. E. Sullivan, wrote its penultimate paragraph which falsely stated that "the government is aware of no evidence to support any suggestion that Allen asked [Ms. Tyree] to make a false statement":

> In 2007, the government became aware of a *suggestion* that, a number of years ago, Allen asked the "other female" [Ms. Tyree] to make a sworn, false statement concerning their relationship. After hearing that suggestion, the *government conducted a thorough investigation and was unable to find any evidence to support it*. The investigation included: (a) an inquiry to the "other female," [Ms. Tyree] who denied the suggestion; (b) an inquiry to Allen, who denied the suggestion; (c) a review of notes taken by a federal law enforcement agent [Agent Eckstein] during a 2004 interview of the "other female," [Ms. Tyree]; and (d) a review of notes taken by a federal prosecutor [AUSA Russo] during a 2004 interview of the "other female [Ms. Tyree]." Because *the government is aware of no evidence to support any suggestion that Allen asked the "other female" [Ms. Tyree] to make a false statement under oath*, neither <u>Brady</u> nor <u>Giglio</u> apply.

---

its *Brady* obligations. Letter from B. Morris, dated Sept. 5, 2008, to A. Romain (DOJ Bates no. CRM095739).

On Sept. 9, 2009, Williams & Connolly filed a motion for an order compelling the prosecutors to disclose, *inter alia*, "copies of all exculpatory grand jury testimony, FBI Form 302 witness interview memoranda, and all contemporaneous notes of witness interviews, including notes or memoranda reflecting false statements by the witnesses" and "further details" of APD's investigations of Mr. Allen. *United States v. Stevens*, Motion to Compel Discovery Pursuant to *Brady v. Maryland* and Fed. R. Crim. P. 16, dated Sept. 2, 2008, at 4 & 8 (Dkt. No. 60). On the same day, Williams & Connolly, referencing its letters dated August 15 and 18, again requested *Brady* information regarding the "rumored personal vices" of Mr. Allen, Rocky Williams and David Anderson. The prosecutors' last *Brady* disclosure letter was sent to Williams & Connolly that same day.

On September 12, 2008, 10 days before trial, Williams & Connolly filed an emergency motion for an order directing the government to produce all *Brady* material "in a useable format - i.e., FBI 302 memoranda, interview notes, and grand jury transcripts (whether redacted or unredacted) - by no later that Friday, September 12, 2008". *Id*., Motion to Compel Emergency Relief and Discovery, dated Sept. 12, 2008, at 1 ( Dkt. No. 65).

15

*United States v. Stevens*, Letter from B. Morris, dated Sept. 9, 2008, to A. Romain, at 5 (Dkt. No. 126-2)(emphasis added).

These astonishing misstatements concealed the existence of documents and information in Mr. Marsh's, Mr. Bottini's and Mr. Goeke's possession and well known to them since at least October 2007, namely, Agent Eckstein's 302, his notes and AUSA Russo's *in limine* motion in *Boehm*, which unequivocally documented Ms. Tyree's admission that she lied under oath at Mr. Allen's request.

The government had every reason to want to avoid any cross-examination of Bill Allen on these issues. Before the trial, Mr. Allen's lawyer, Robert Bundy, told the prosecutors that if Mr. Allen was questioned about Ms. Tyree, he would assert his Fifth Amendment privilege and refuse to answer. Agent Kepner told DOJ investigators in 2009, that "ALLEN would become unglued whenever an article would appear involving allegations related to the APD sexual investigation." Deprived of the information that would have significantly impeached Mr. Allen's credibility, Mr. Sullivan did not cross-examine him about APD's past and pending sexual misconduct investigations or his relationship with Ms. Tyree.

### The Torricelli Note, the Interviews of Mr. Allen on April 15 and September 14, 2008, and Mr. Allen's CYA Testimony

In his opening statement, Brendan Sullivan told the jury that the evidence would show that Senator Stevens had no intent to make any false statements on his Senate Financial Disclosure Forms. Mr. Sullivan explained that, after Christensen Builders completed the renovation, Mr. Allen arranged for repairs on the Girdwood residence and that Senator Stevens pressed Mr. Allen to send him bills for that work, but none was ever sent: "You cannot report what you don't know. You can't fill out a form and say what's been kept from you by the deviousness of someone like Bill Allen". *Stevens,* Trial Transcript, Sept. 25, 2008 A.M., at 74.

Mr. Sullivan focused the jury's attention on two handwritten notes sent by Senator Stevens to Mr. Allen in 2002, the "Torricelli note(s)". The first note referred to Bob Persons, a mutual friend of Senator Stevens and Mr. Allen and a neighbor who informally monitored the work on Senator Stevens's house:

10/6/02
Dear Bill -
　　　　When I think of the many ways in which you make my life easier and more enjoyable, I lose count!
　　　　Thanks for all the work on the chalet. You owe me a bill - remember Torricelli, my friend. Friendship is one thing - compliance with these ethics rules entirely different. I asked Bob P[ersons] to talk to you about this so don't get P.O'd at him - it just has to be done right.
　　　　Hope to see you soon.
　　　　　　　　　My best,
　　　　　　　　　Ted
　　　　　　　　　　　•　　•　　•
11/8/02
Dear Bill:
Many thanks for all you've done to make our lives easier and our home more enjoyable. … (Don't forget we need a bill for what's been done out at the chalet) …

　　　　My best
　　　　Ted

*Id.,* Government Trial Exh. 495 & 509.[5]

Mr. Sullivan described the notes as evidence that "jumps off the page and grabs you by the throat to show you what the intent of Ted Stevens was." *Id.*, Trial Transcript, Sept. 25, 2008 A.M., at 73.

　　　　One week later, Mr. Bottini used the Torricelli notes to turn the tables on the defense when he elicited dramatic testimony from Mr. Allen about why he never sent any bills to Senator Stevens for work performed by VECO's employees. On direct examination by Mr. Bottini, Mr. Allen testified that after he received the Torricelli note he spoke to Bob Persons who told him "don't worry about getting a

---

　　　　[5]*See* Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, at 14 (DOJ Bates no. CRM016390) ("We note that in July 2002, Senator Torricelli was publicly admonished by the United States Senate for accepting numerous gifts from a wealthy fundraiser, and that on September 30, 2002 – one week before STEVENS wrote the note to Allen – Senator Torricelli withdrew from his Senate re-election race.").

bill. He said, Ted is just covering his ass." *Id.,* Trial Transcript, Oct. 1, 2008 A.M., at 52 (the "CYA statement").

The defense was shocked by Mr. Allen's CYA testimony. None of the 55 FBI 302s of the government's interviews of Mr. Allen from Aug. 30, 2006, to Sept. 9, 2008, which were provided to him by the prosecutors, contained any reference by Mr. Allen to this CYA statement. During his cross-examination of Mr. Allen on Oct. 6, 2008 (six years to the day after the Torricelli note was written), Mr. Sullivan accused Mr. Allen of inventing that testimony recently:

> Q. Well, you came in here the other day on your direct examination, and you said, well, despite the fact that I saw this letter, I heard from Mr. Persons I shouldn't send a bill because this was just Ted covering his ass; do you remember that testimony?
>
> A. That's exactly right.

> Q. When did you first tell that story? When did you first say those words? Was it in the last -- since September 9th? Was it since September 9th?
>
> A. It's been so long that I can't tell you how many days before I talked to him, but I did, and I asked him, hey, I got to get something done. I've got to get some invoices. And he said, hell, don't worry about the invoices. Ted is just covering his ass. That's exactly what he said.

> Q. My question to you, sir, is when did you first tell the government that because on September 9th, 2008, you were giving them three other reasons why you didn't send the bill.
>
> A. I don't know.

> Q. When did it come to you, sir?
>
> A. What?

> Q. When did you first tell the government that Persons toll [sic] you Ted was covering his ass and these notes were meaningless? It was just recently, wasn't it?
>
> A. No. No.

18

Q.    On September 9th, you didn't tell them that, did you?

A.    Hell, I don't know whatever --

Q.    You gave them reasons why you didn't send a bill. You answered you simply wanted to do the work was one of them, and another was part of the reason was that the costs were higher than they needed to be. You didn't tell them then about Persons' conversation with you, did you?

A.    You know what, I don't know when I talked to them, but I did talk to him, and it's been quite aback, quite awhile back. Whether you like it or you don't.

Q.    When did you first come up with this, sir?

A.    When did I come up with it?

Q.    When did you first tell somebody?

A.    Huh?

Q.    When did you first tell a government agent?

A.    Hell, I don't know I don't know what day it was.

MR. SULLIVAN: Your Honor, is this a good time for a break?

*Id.,* Trial Transcript, Oct. 6, 2008 P.M., at 79-81.

Mr. Allen's denial was false. He told Mr. Bottini and Agent Kepner about the CYA statement by Mr. Persons for the first time on Sept. 14, 2008, a week before the trial began, during a trial preparation session for which no 302 was written.

Mr. Bottini knew the testimony was false and knew that he had an obligation under the Supreme Court's decision in *Napue v. Illinois*, 360 U.S. 264 (1959) to correct that testimony there and then, but he did not. He testified in this investigation that he understood that Mr. Sullivan was attempting to establish that Mr. Allen had recently fabricated his CYA testimony and that Mr. Allen's testimony on this point was "factually inaccurate". Deposition of J. Bottini, Dec. 17, 2008, at 650. At the time, Mr. Bottini did not believe that Mr. Allen's testimony was intentionally false because he thought that Mr. Allen was confused and

19

misunderstood the question. Mr. Bottini testified that he was familiar with a prosecutor's obligations under *Napue* to correct false testimony, but he did not "remember thinking at the time should I get up and say something to Judge Sullivan." *Id*. at 652.

However, not only did he fail to correct the false statement as was required by *Napue*, Mr. Bottini endorsed and capitalized on Mr. Allen's false denial during his summation:

> [Senator Stevens] says I did ask for a bill for 2002 work. Government 495 is the note he sent on October 6th, 2002, the Torricelli note, and you remember what Bill Allen said after that? Bob Persons did pay him a visit, came by and he told him, look, he doesn't really want a bill. He's just – pardon my French -- covering his ass. Now the defendant says, well, Allen just made that up, that's a lie, that never happened. Again, you saw and you heard from Bill Allen and you saw and you heard from Bob Persons. You can judge yourself the credibility of those two individuals. Again, if that were so, if Allen just made that up, wouldn't the story be better about that?

> *Id.*, Trial Transcript, Oct. 21, 2008 A.M., at 54.[6]

Mr. Sullivan never learned during the trial that Mr. Allen told Mr. Bottini about the CYA statement for the first time on Sept. 14, 2008. And he was also never told about a prior inconsistent statement made by Mr. Allen to Mr. Bottini, Mr. Goeke, Mr. E. Sullivan, Mr. Marsh and Agent Kepner which would have supported his accusation on cross-examination that Mr. Allen's CYA testimony was a recent fabrication, namely, that Mr. Allen had previously told them he didn't remember any conversation with Mr. Persons about sending a bill.

When Mr. Allen told Mr. Bottini and Agent Kepner about the CYA statement on Sept. 14, 2008, the prosecutors became obligated by *Brady* and *Giglio* to disclose Mr. Allen's prior inconsistent statement to them during an interview on April 15, 2008, that he did *not* remember speaking to Bob Persons about the

---

[6]Bob Persons testified as a defense witness at trial and denied telling Mr. Allen, "Bill, don't worry about getting a bill, Ted is just covering his ass". *Id.*, Trial Transcript, Oct. 15, 2008 P.M., at 44.

Torricelli note. But Mr. Bottini and his colleagues never disclosed that impeachment information to Williams & Connolly. They also never disclosed other *Brady* information provided to them by Mr. Allen during his interviews on April 15 and April 18, 2008, that the value of VECO's work on the Girdwood residence was about $80,000, and not more than $250,000 as alleged in the indictment.

Mr. Bottini, Mr. Goeke, Mr. Marsh, Mr. E. Sullivan and Agent Kepner testified in this investigation that they forgot that they had shown the Torricelli note to Mr. Allen on April 15, 2008, and that they forgot that he had then told them that he did *not* remember speaking to Bob Persons about the note. Agent Kepner, who conducted the *Brady* review of Mr. Allen's prior statements, also testified that had she remembered Mr. Allen's prior inconsistent statement, she would not have recognized its significance under *Brady* and *Giglio*.

Mr. Bottini's, Mr. Goeke's, Mr. E. Sullivan's and Agent Kepner's notes of their meeting with Mr. Allen on April 15, 2008, all reflect his statement that he did not remember speaking to Mr. Persons about the Torricelli note. However, Mr. Goeke and Mr. E. Sullivan testified that they did not review any of their notes of witness interviews for *Brady* material. Mr. Bottini testified that he did review his notes of witness interviews for *Brady* material, except for his notes of Mr. Allen's interviews on April 15 and 18, 2008, which he misfiled. Mr. Marsh testified that he usually did not take notes, that he did not find any notes of the interview on April 15, 2008, and that he remembered reviewing only some of his notes for *Brady* material. Agent Kepner did not write a 302 of the interview on April 15, 2008, because, as she later told DOJ investigators, "the debriefing of Bill Allen did not go well", and she could not find her notes of that interview. DOJ's Office of Professional Responsibility ("OPR") found her notes on Jan. 14, 2010, and they also contain Mr. Allen's statement that he did not remember speaking with Mr. Persons about the Torricelli note.

The complete, simultaneous and long term memory failure by the entire prosecution team, four prosecutors and the FBI case agent, of the same statement about an important document made at the same meeting by their key witness in a high profile case is extraordinary. Considering the galvanizing effect the Torricelli notes had on the prosecutors during the weeks following its receipt, that memory failure becomes astonishing. Add the fact that Ms. Morris, who did not attend the meeting, remembered being told shortly after the Torricelli notes were received that

Mr. Allen said he didn't recall seeing the Torricelli note and/or speaking with Bob
Persons about it, and that collective memory failure strains credulity. Ms. Morris
testified that, when Mr. Marsh later told her about Mr. Allen's CYA statement, she
remembered that Mr. Allen had been previously interviewed about the Torricelli
note, but she didn't recall "there being a difference" in his statements.

The Torricelli notes worried the prosecutors and Agent Kepner, and captured
their attention, in April and May, 2008, but no cure for the problem created by
those notes for the government's case was found until the week before the trial
began when Mr. Allen's memory suddenly improved, after prodding by Agent
Kepner.

On April 8, 2008, Williams & Connolly produced the Torricelli notes and
other documents to the prosecutors, who immediately recognized their significance.
They made an appointment that same day to meet with Mr. Allen on April 15,
2008, to discuss them. Agent Kepner told her supervisor the same day that the
notes might be fatal to the case: "Bill Welch did not seem to be too upset about the
notes that were found related to Stevens asking Bill for invoices. I got ahold of
Bundy and Bill Allen. We will debrief Bill on Tuesday regarding the new
documents received from Stevens. Too early to tell if this issue will be fatal or not.
I'm worried that this may give DOJ an out if they were looking for one." Email
from Agent Kepner, dated April 8, 2008, to FBI SAC C. Seale.

On April 11, 2008, the prosecutors discussed the Torricelli notes in a
memorandum to AAG Fisher and attached the notes as one of two exhibits. The
memorandum explained how the Torricelli notes were "both helpful and harmful to
STEVENS". Memorandum to Alice S. Fisher, dated April 11, 2008, from William
Welch and Brenda Morris, at 14. The prosecutors also noted "two troubling
irregularities concerning the October 6, 2002, note", their "concerns about the
document's authenticity", and their plan to interview Senator Stevens's archivist
the following week "to explore the manner in which this document was located and
produced." *Id*. at 15.

On Monday, April 15, 2008, the entire prosecution team, Mr. Bottini, Mr.
Marsh (by phone), Mr. Goeke, Mr. E. Sullivan (by phone) and Agent Kepner,
interviewed Mr. Allen in the presence of his attorney, Mr. Bundy, about the
Torricelli notes and other documents produced by Williams & Connolly. During

the interview, the prosecutors exchanged emails evidencing dissatisfaction with
Mr. Allen's answers to their questions:

> Email from Mr. E. Sullivan to Mr. Bottini, Mr. Goeke and Mr. Marsh
> Subject: RE: am I pushing too hard?":
>> We may want to talk to Bundy immediately afterwards and get him to
>> push BA on this issue and get him to focus. BA's position makes no
>> sense and is directly contradicted by his contemporaneous acts.
>>
>> I'd also like to push BA re: why TS is asking for a bill in 10/02 and
>> 11/02. The timing is bothering me. Is it b/c the project is out of
>> control? Only VECO guys are on the site? Neighbors are snooping
>> around? Public is about to find out?

> Reply from Mr. Marsh to Mr. E. Sullivan, Mr. Bottini and Mr. Goeke:
>> Re: #2, do you think it's probably that his friend Torricelli withdrew
>> from his reelection campaign a week before the 10/02 note?

> Reply from Mr. E. Sullivan to Mr. Bottini, Mr. Goeke and Mr. Marsh:
>> Could be. Could also be that it's a wink and a nod -- that he knows BA
>> won't send him an invoice, but he can paper the file. Could be a lot of
>> things. I was hoping BA might be able to shed some light on the
>> timing/context.

> Reply from Mr. Marsh to Mr. E. Sullivan, Mr. Bottini and Mr. Goeke:
>> Sorry -- I thought we all believed it's a wink and a nod, and we're just
>> trying to figure out why TS was nervous at that particular moment and
>> decided to paper the file with something. Am I wrong?

> Emails between N. Marsh, J. Bottini, J. Goeke and E. Sullivan, dated April
> 15, 2008 (DOJ Bates nos. CRM16532).

Mr. Allen was also questioned that day about the value of VECO's work on
the Girdwood residence, an issue which the prosecutors expected would be, and
was, contested by the defense at trial. *See* Memorandum to Alice S. Fisher, dated
April 11, 2008, from William Welch and Brenda Morris, Exh. A, p. 3 ("Value of
the work was not worth what VECO's billing records/other invoices reflect: Here,

TS would suggest that the $250K value of VECO's work is over-inflated.")
(emphasis in original). Mr. Bottini's, Mr. Goeke's and Mr. E. Sullivan's notes
reflect that Mr. Allen told them that the value of VECO's work was about $80,000,
not $250,000 as the prosecutors contended during the meeting. Mr. Bundy testified
in this investigation that Mr. Allen was "pretty vociferous" during the meeting in
maintaining that the value of VECO's services was not $250,000, and could not
have been more than $80,000. Deposition of R. Bundy, Nov. 4, 2009, at 63. Mr.
Bundy testified that the government's position was "more or less we have the
VECO books that show $250,000 was billed to this. And that was sort of the
impasse." *Id*. at 69.

Mr. Allen testified in this investigation that Agent Kepner told him after the
meeting on April 15, 2008, that he "didn't do very good" and that the prosecutors
"were upset … weren't very happy". Agent Kepner did not write a 302 for this
interview of Mr. Allen. She told DOJ investigators in 2009 that no 302 was written
because "the debriefing of Bill Allen did not go well".

On April 18, 2008, Mr. Bottini, Mr. Goeke, Mr. Marsh and Agent Kepner
interviewed Mr. Allen again in the presence of Mr. Bundy. Mr. Goeke's and Mr.
Bundy's notes of this meeting reflect that Mr. Allen reiterated that the value of
VECO's work on the Girdwood residence was approximately $80,000. Agent
Kepner did not write a 302 for this interview.

Mr. Allen was the principal owner of VECO and was familiar with the work
done on the Girdwood residence. His statements on April 15 and 18, 2008, that the
value of VECO's work on the Girdwood residence was $80,000, constituted
significant *Brady* information. However, that information was not recorded in any
302 and was not disclosed to Williams & Connolly until 2009, after the trial, when
the new team of prosecutors took over.

On April 24, 2008, William Arthur, Senator Stevens's archivist, was
interviewed in Washington by the entire prosecution team, Mr. Bottini, Mr. Marsh,
Mr. Goeke, Mr. E. Sullivan and Agent Kepner.

On May 1, 2008, Barbara Flanders was interviewed by Mr. Marsh, Mr.
Bottini, Mr. Goeke, and Mr. E. Sullivan; Agent Kepner testified that she might
have been present. Ms. Flanders was a staff assistant to Senator Stevens and they

24

exchanged emails in December 2002 about bills that were expected to be soon received for work on the Girdwood residence. In one email, Senator Stevens told Ms. Flanders that "Bob Persons is riding herd to make sure we get charged for what they have done." When Williams & Connolly produced these emails to the prosecutors on April 25, 2008, Mr. Marsh forwarded them to his colleagues the same day with the comment that "these emails are not good". Mr. Bottini replied, "I agree, not good, but obviously not fatal either." No 302 was written of the Flanders interview.

On May 8, 2008, Mr. Bottini, Mr. Marsh, Mr. Goeke and Mr. E. Sullivan interviewed Bob Persons. He was not asked any questions related to the Torricelli note.

On May 15, 2008, Mr. Marsh revised the prosecution memorandum and added a two-page discussion of the Torricelli notes and the email exchanges between Senator Stevens and Mrs. Flanders in December 2002, which he described as "both helpful and harmful to STEVENS".

The sum of that information remained the *status quo* until September, 2008. On Sept. 9, 2008, as the last *Brady* disclosure letter was drafted, Mr. Marsh directed Agent Kepner to call Mr. Allen, who was in Alaska, and to ask him whether he thought Senator Stevens would have paid a bill for VECO's work on the renovation. Agent Kepner questioned Mr. Allen and repeated his answers to Mr. Marsh who then and there wrote paragraph 17(c) of the government's *Brady* letter:

> Allen stated that on at least two occasions defendant asked Allen for invoices for VECO's work at the Girdwood residence. Allen stated he never sent an invoice to defendant or caused an invoice to be sent to defendant. Allen stated that he believed that defendant would not have paid the actual costs incurred by VECO, even if Allen had sent defendant an invoice, because defendant would not have wanted to pay that high of a bill. Allen stated that defendant probably would have paid a reduced invoice if he had received one from Allen or VECO. Allen did not want to give defendant a bill partly because he felt that VECO's costs were higher than they needed to be, and partly because he simply did not want defendant to have to pay.

Letter from B. Morris, dated Sept. 9, 2008, to A. Romain, ¶ 17(c).

On Sept. 16, 2008, Agent Kepner wrote a 302 of that interview of Mr. Allen, after Judge Sullivan ordered the prosecutors to produce all 302s containing *Brady* information to Williams & Connolly. Neither Agent Kepner's 302 nor paragraph 17(c) of the *Brady* letter contains any reference to the CYA conversation between Mr. Allen and Mr. Persons about the Torricelli note.

Mr. Allen testified in this investigation that the memory of the CYA statement came to him during his flight to Washington, D.C. for the trial, after some prodding by Agent Kepner. Shortly before the trip, Agent Kepner told him "that you better figure out or remember what you done with this Torricelli note from Ted. … You got to figure out what you done and when did you talk to Bob Persons." Deposition of B. Allen, March 6, 2010, at 21 & 42. Mr. Allen and Mr. Bundy arrived in Washington on Friday, Sept. 12, 2008, and they met with Mr. Bottini and Agent Kepner on Sept. 13 and 14 for trial preparation.

During the meeting on Sept. 14, 2008, Mr. Allen told Mr. Bottini and Agent Kepner that he remembered speaking with Mr. Persons after receiving the Torricelli note and that Mr. Persons told him that Senator Stevens was "covering his ass by asking for a bill." Mr. Bottini recognized immediately the significance of this conversation and he informed the entire team, except for Mr. Goeke who was still in Alaska. Agent Kepner testified in this investigation that she was not surprised by Mr. Allen's new recollection. She viewed the Torricelli note as "a cover your ass note" and "It fit. In my mind, it made sense." Deposition of Agent Kepner, Aug. 24, 2009, at 215-216; *see also id*. at 270-271 (she viewed the Torricelli notes as "pretextual") & at 307-308 (well in advance of this trial prep session, she believed that Senator Stevens was "covering his ass" with the Torricelli note).

Mr. Allen's statement on Sept. 14, 2008, which contradicted his testimony on cross-examination on Oct. 6, 2008, that he had not just recently told the prosecutors about the CYA statement, was not disclosed to Williams & Connolly until March, 2009, when the new team of prosecutors reviewed their predecessors' files and discovered some notes of the interview of Mr. Allen on April 15, 2008. Shortly after the discovery of those notes, DOJ moved to dismiss the indictment with prejudice:

In February 2009, the Acting Assistant Attorney General for the Criminal Division appointed undersigned counsel to conduct the post-trial litigation in this matter. In preparing to respond to defendant Theodore Stevens' various motions and in preparation for a possible evidentiary hearing, undersigned counsel began collecting and reviewing documents and interviewing potential witnesses. As the Court is aware, the Government has voluntarily provided to the defense documents and summaries of witness interviews.

The Government recently discovered that a witness interview of Bill Allen took place on April 15, 2008. While no memorandum of interview or agent notes exist for this interview, notes taken by two prosecutors who participated in the April 15 interview reflect that Bill Allen was asked about a note dated October 6, 2002, that was sent from the defendant to Bill Allen. The note was introduced at trial as Government Exhibit 495 and was referred to as the "Torricelli note." The notes of the April 15 interview indicate that Bill Allen said, among other things, in substance and in part, that he (Bill Allen) did not recall talking to Bob Persons regarding giving a bill to the defendant. This statement by Allen during the April 15 interview was inconsistent with Allen's recollection at trial, where he described a conversation with Persons about the Torricelli note. In addition, the April 15 interview notes indicate that Allen estimated that if his workers had performed efficiently, the fair market value of the work his corporation performed on defendant's Girdwood chalet would have been $80,000. Upon the discovery of the interview notes last week, the Government immediately provided a copy to defense counsel.

Defendant Stevens was not informed prior to or during trial of the statements by Bill Allen on April 15, 2008. This information could have been used by the defendant to cross-examine Bill Allen and in arguments to the jury. The Government also acknowledges that the Government's Opposition to Defendant's Motion for a New Trial provided an account of the Government's interviews of Bill Allen that is inaccurate. See Opposition at 42-43 (Dkt. No. 269).

Given the facts of this particular case, the Government believes that granting a new trial is in the interest of justice. See Fed. R. Crim. P. 33(a). The Government has further determined that, based on the totality of circumstances and in the interest of justice, it will not seek a new trial.

Accordingly, pursuant to Fed. R. Crim. P. 48(a), the Government moves to set aside the verdict and dismiss the indictment with prejudice.

*United States v. Stevens*, Motion of the United States to Set Aside the Verdict and Dismiss the Indictment with Prejudice, April 1, 2009, at 1-2 (Dkt. No. 324).

## Findings and Conclusions

Although the simultaneous failure by Mr. Bottini, Mr. Marsh, Mr. Goeke and Mr. E. Sullivan to recall their interview of Mr. Allen on April 15, 2008, and his statement that he did not recall speaking with Mr. Persons about the Torricelli notes, is difficult to believe, there is no evidence that would establish beyond a reasonable doubt that any one or more of them did in fact recall that information and concealed it from Williams & Connolly and the Court.

However, our investigation found evidence which compels the conclusion, and would prove beyond a reasonable doubt, that other *Brady* information was intentionally withheld from the attorneys for Senator Stevens:

- Mr. Bottini and Mr. Goeke intentionally withheld and concealed significant exculpatory information which they obtained from Rocky Williams during pre-trial witness preparation interviews in August and September, 2008;

- Mr. Bottini and Mr. Goeke intentionally withheld and concealed significant impeachment information regarding Mr. Allen's subornation of perjury by Ms. Tyree; and

- Mr. Bottini withheld significant impeachment information by his intentional failure to correct materially false testimony given by Mr. Allen during his cross-examination, which Mr. Bottini knew at the time was false.[7]

---

[7]Mr. Marsh passed away on Sept. 26, 2010, and, for that reason, we express no conclusion regarding his conduct.

Although the evidence establishes that this misconduct was intentional, the evidence is insufficient to establish beyond a reasonable doubt that Mr. Bottini and Mr. Goeke violated the criminal contempt statute, 18 U.S.C. § 401, which requires the intentional violation of a clear and unambiguous order. Although a reading of the transcripts of numerous hearings and proceedings before and during the trial establish that Judge Sullivan intended that all *Brady* and *Giglio* material be produced, none of the orders issued by Judge Sullivan, before or during the trial, specifically directed the prosecutors to disclose all *Brady/Giglio* information in their possession. In large part, this was because of representations made by prosecutors to the Court that such an order was unnecessary.

The Court contemplated issuing such an order before trial but did not, accepting instead the prosecutors' representations during a hearing on Sept. 10, 2008, the day after their second *Brady* disclosure letter was sent, that they knew and had complied with their *Brady* and *Giglio* disclosure obligations:

MR. E. SULLIVAN:          … Now, just jumping back over to the Brady-Giglio, just briefly, we fully understand what our obligation is, and I don't think we need to belabor the Court because the case law is clear on this issue.

THE COURT:                What should the Court do?
MR. E. SULLIVAN:          We don't think that there's anything for the Court to do. We have --

THE COURT:                Should the Court just issue an order and say everyone recognizes what Marshall says, Safavian says, Poindexter says, and a litany of other cases say, and so the government is directed to immediately -- to forthwith provide to defense counsel any outstanding Brady material as defined by those cases and on an ongoing daily basis provide information as that information becomes in the possession, knowledge, control of the government, should the Court do that?
MR. E. SULLIVAN:          We don't think so, your Honor. We understand --

29

| | |
|---|---|
| THE COURT: | How are you prejudiced if I do it, though? |
| MR. E. SULLIVAN: | The Court can. If it wants to issue an order to that effect, we will comply with that order. |
| | |
| THE COURT: | The government's position should be, Judge, that's just surplus, because all of us know what the law is? |
| MR. E. SULLIVAN: | Absolutely, your Honor. |
| | |
| THE COURT: | I'll just issue an order as a general reminder to the government to remind it of its daily ongoing obligation to produce that material. |
| MR. E. SULLIVAN: | Fair enough. We just want to make -- |
| | |
| THE COURT: | What about impeachment material of government witnesses, though, is that Brady material? |
| MR. E. SULLIVAN: | We have produced both Brady and Giglio. We treated the terms interchangeably. We viewed it all as Brady material. |
| | |
| THE COURT: | I don't need to say anything more about Brady, at least today anyway? |
| MR. E. SULLIVAN: | That's true, your Honor. One thing we do want to clarify, though, a portion of our letter from last evening was read on the record giving the impression that we're still sitting on a treasure trove of Brady-Giglio material. That's simply not the case. … |

*Id.*, Transcript of Motions Hearing, Sept. 10, 2008 10:09 a.m., at 73-75.

At the conclusion of that hearing, Judge Sullivan decided that an order directing the prosecutors to disclose *Brady* information was unnecessary:

| | |
|---|---|
| THE COURT: | … The motion to compel, I think that every aspect of the motion [by Senator Stevens] to compel [Discovery Pursuant to *Brady v. Maryland* and Fed. R. Crim. P. 16] |

has been resolved, but I want to be clear about that. You know what, I'm not going to write an order that says "follow the law." We all know what the law is. The government -- I'm convinced that the government in its team of prosecutors is thoroughly familiar with the decisions from our Circuit and from my colleagues on this Court, and that they, in good faith, know that they have an obligation, on an ongoing basis to provide the relevant, appropriate information to defense counsel to be utilized in a usable format as that information becomes known or in the possession of the government, and I accept that. I'm not going to -- I don't have the time or the interest to draft another order saying, you know, follow *Marshall*, follow *Savavian* [sic], follow *Poindexter*, follow all the opinions that my colleagues have issued. Follow the law, and Hinson and Wise [probably should be "hints to the wise"] should be sufficient. …

*Id.*, Transcript of Pretrial Conference Proceedings, Sept. 10, 2008 P.M., at 14-15.

31