# EXHIBIT 2



# Department of Justice

**STATEMENT FOR THE RECORD**

**SUBCOMMITTEE ON CRIME, TERRORISM, AND HOMELAND SECURITY
COMMITTEE ON THE JUDICIARY
U.S. HOUSE OF REPRESENTATIVES**

**HEARING ON THE PROSECUTION OF FORMER SENATOR TED STEVENS**

**APRIL 19, 2012**

**Statement for the Record from the Department of Justice**

**Subcommittee on Crime, Terrorism, and Homeland Security**
**Committee on the Judiciary**
**U.S. House of Representatives**

**Hearing on the Prosecution of Former Senator Ted Stevens**
**April 19, 2012**

1. **Introduction**

The Department of Justice respectfully submits this statement for the record for today's hearing before the House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security, on the prosecution of former Senator Ted Stevens.

When concerns were first raised about the handling of the prosecution of Senator Stevens, the Department immediately conducted an internal review. The Attorney General recognized the importance of ensuring trust and confidence in the work of Department prosecutors and took the extraordinary step of moving to dismiss the case when errors were discovered. Moreover, to ensure that the mistakes in the *Stevens* case would not be repeated, the Attorney General convened a working group to review discovery practices and charged the group with developing recommendations for improving such practices so that errors are minimized. As a result of the working group's efforts, the Department has taken unprecedented steps, described more fully below, to ensure that prosecutors, agents, and paralegals have the necessary training and resources to fulfill their legal and ethical obligations with respect to discovery in criminal cases. These reforms include a sweeping training curriculum for all federal prosecutors and the requirement – for the first time in the history of the Department of Justice – that every federal prosecutor receive refresher discovery training each year.

In light of these internal reforms, the Department does not believe that legislation is needed to address the problems that came to light in the *Stevens* prosecution. Such a legislative proposal would upset the careful balance of interests at stake in criminal cases, cause significant harm to victims, witnesses, and law enforcement efforts, and generate substantial and unnecessary litigation that would divert scarce judicial and prosecutorial resources. As was recently recognized by the Advisory Committee on Criminal Rules of the Judicial Conference of the United States ("Criminal Rules Committee"), which in 2010-11 considered and rejected changes to Rule 16, true improvements to discovery practices will come from prosecutors and agents having a full appreciation of their responsibilities under their existing obligations, rather than by expanding those obligations.

2. **The Schuelke Report on the prosecution of Senator Stevens and the OPR investigation**

As Mr. Schuelke acknowledged in his report, the Department cooperated fully with Mr. Schuelke's inquiry into the prosecution of former Senator Ted Stevens. The Department's Office of Professional Responsibility ("OPR") separately investigated allegations of professional

1

misconduct by prosecutors in the *Stevens* case. Although OPR and Mr. Schuelke worked together and shared information throughout the investigative process, OPR is required to make an independent assessment of the allegations of misconduct. The entire Department misconduct review involves various steps, and the process is not finished until all the necessary steps have been completed. No formal action is taken against a Department employee until the disciplinary process is final.

The Department seeks to be as transparent as possible with respect to decisions involving our attorneys. Nonetheless, the Department must also comply with the provisions of the Privacy Act, and disclosures of information from OPR and Office of Inspector General investigations that examine the conduct of individual Department employees have significant Privacy Act implications. The Department's misconduct review process is in its last stages. To the extent it is appropriate and permissible under the law, we will endeavor to make the OPR findings public when that review is final.

The Department acknowledges the wide variety of discovery failures that occurred in the *Stevens* case. These failures are core topics of the Department's training regimen. The discovery training and resources that have been put in place over the past three years are designed, in part, to minimize the likelihood that the types of failures that occurred in *Stevens* will happen again.

**3. The Department's response to the discovery failures that occurred in *Stevens***

Attorney General Holder, who had taken office shortly after the *Stevens* trial, acted swiftly and decisively after learning of the discovery failures that occurred in that case. A new team of seasoned prosecutors was assigned to review the matter, and they determined that Senator Stevens and his attorneys had not been provided access to information they were entitled to receive. Because the undisclosed information could have affected the outcome of the case, the Attorney General took the extraordinary and appropriate step of dismissing the prosecution of Senator Stevens. He also ordered a comprehensive review of all discovery practices and related procedures across the country to reduce the likelihood of future discovery failures. Over the past three years, as summarized in the Attorney General's memorandum to all federal prosecutors, dated March 27, 2012, the Department has taken extraordinary steps to provide prosecutors and agents with the training and resources necessary to meet their discovery obligations. Those steps are described in bullet points below.

The discovery failures in the *Stevens* case were not typical and must be considered in their proper context. Over the past 10 years, the Department has filed over 800,000 cases involving more than one million defendants. In the same time period, only one-third of one percent (.33 percent) of these cases warranted inquiries and investigations of professional misconduct by the Department's Office of Professional Responsibility. Less than three-hundredths of one percent (.03 percent) related to alleged discovery violations, and just a fraction of these resulted in actual findings of misconduct. Department regulations require DOJ attorneys to report any judicial finding of misconduct to OPR, and OPR conducts computer searches to identify court opinions that reach such findings in order to confirm that it examines any judicial findings of misconduct, reported or not. In addition, defense attorneys are not reticent to raise allegations of discovery failures when they do occur.

Our prosecutors and agents work hard to keep our country and communities safe and to ensure that criminals are brought to justice honorably and ethically.  Nonetheless, when there is even a single lapse, we must, and we do, take it seriously, because it could call the integrity of our criminal justice system into question and could have devastating consequences.  In April 2009, within days after the *Stevens* case was dismissed, the Criminal Discovery and Case Management Working Group was created to review the Department's policies, practices, and training concerning criminal case management and discovery, and to evaluate ways to improve them. Our comprehensive review of discovery practices identified some areas where the Department could improve, and we have undertaken a series of reforms which have since been institutionalized.

In January 2010, the Office of the Deputy Attorney General issued three memoranda to all criminal prosecutors: "Issuance of Guidance and Summary of Actions Taken in Response to the June 2009 Report of the DOJ Criminal Discovery and Case Management Working Group," "Requirement for Office Discovery Policies in Criminal Matters," and "Guidance for Prosecutors Regarding Criminal Discovery."  These memoranda provide overarching guidance on gathering and reviewing potentially discoverable information and making timely disclosure to defendants; they also direct each U.S. Attorney's Office and Department litigating component to develop additional, district- and component-specific discovery policies that account for controlling precedent, existing local practices, and judicial expectations.  Subsequently, the Office of the Deputy Attorney General has issued separate guidance relating to discovery in national security cases and discovery of electronic communications.

Later in January 2010, the Deputy Attorney General appointed a long-serving career prosecutor as the Department's first full-time National Criminal Discovery Coordinator to lead and oversee all Department efforts to improve disclosure policies and practices.  Since January 2010, the Department has undertaken rigorous enhanced training efforts, provided prosecutors with key discovery tools such as online manuals and checklists, and continues to explore ways to address the evolving nature of e-discovery.  These steps have included:

- All federal prosecutors are now required to undertake annual update/refresher discovery training.  Roughly 6,000 federal prosecutors across the country – regardless of experience level – receive the required training annually on a wide variety of criminal discovery-related topics.

- During 2010-11, the Department's National Criminal Discovery Coordinator traveled to approximately 40 U.S. Attorney's Offices throughout the country to present four-hour blocks of training on prosecutors' disclosure obligations under *Brady*, *Giglio*, the Jencks Act, Rule 16, and the U.S. Attorneys' Manual ("USAM"), as well as on the discovery implications of electronically stored information ("ESI").  He also conducted numerous training sessions for prosecutors and other law enforcement officials at Main Justice in Washington, D.C. – including a series of training sessions for attorneys at OPR and the Department's Professional Responsibility Advisory Office – and at the National Advocacy Center in Columbia, South Carolina.

- Since 2010, the Department has held several "New Prosecutor Boot Camp" courses, designed for newly hired federal prosecutors, which include training on *Brady*, *Giglio*, and ESI, among other topics.

- These training requirements were institutionalized through their codification in the USAM. Specifically, USAM § 9-5.001 was amended in June 2010 to make training mandatory for all prosecutors within 12 months after hiring, and requiring two hours of update/refresher training on an annual basis for all other prosecutors.

- In 2011, the Department provided four hours of training to more than 26,000 federal law enforcement agents and other officials – primarily from the FBI, DEA, and ATF – on criminal discovery policies and practices. The Department is currently developing annual update/refresher training for these agents.

- In late February 2012, the Department held "train-the-trainer" programs in Washington, D.C., to begin training the next round of federal law enforcement agencies, including Department of Homeland Security agencies such as ICE, various OIGs, and other federal agencies.

- The Department has held several Support Staff Criminal Discovery Training Programs, including one session last month. In addition, the Department has produced criminal discovery training materials for victim/witness coordinators.

- A Federal Criminal Discovery Blue Book – which comprehensively covers the law, policy, and practice of prosecutors' disclosure obligations – was created and distributed to prosecutors nationwide in 2011. It is now electronically available on the desktop of every federal prosecutor and paralegal.

- One of the most challenging issues for prosecutors in meeting their discovery obligations in the digital age is the explosion of ESI. The Department developed – in collaboration with representatives from the Federal Public Defenders and counsel appointed under the Criminal Justice Act – a ground-breaking criminal ESI protocol. The protocol was distributed to prosecutors, defense attorneys, and members of the federal judiciary in February 2012. It is designed to:

    o promote the efficient and cost-effective production of ESI discovery in federal criminal cases;
    o reduce unnecessary conflict and litigation over ESI discovery by encouraging the parties to communicate about ESI discovery issues;
    o create a predictable framework for ESI discovery; and
    o establish methods for resolving ESI discovery disputes without the need for court intervention.

    The protocol has already received praise from the judiciary and defense bar. The Department is in the process of developing training on the protocol for prosecutors, defense attorneys, and the judiciary.

4

- In order to ensure consistent long-term oversight of the Department's discovery practices, the Department moved the National Criminal Discovery Coordinator position into the Office of the Deputy Attorney General and made it a permanent executive-level position.

The Department's own policies require federal prosecutors to go beyond what is required to be disclosed under the Constitution, statutes, and rules. For example, under the USAM, prosecutors are directed to take a broad view of their obligations and resolve close calls in favor of disclosing exculpatory and impeaching evidence. The USAM requires prosecutors to disclose information beyond that which is "material" to guilt as articulated by the U.S. Supreme Court, and prosecutors must disclose exculpatory or impeachment information "regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime." USAM § 9-5.001. In addition, pursuant to the January 2010 memoranda issued by then-Deputy Attorney General David Ogden, prosecutors have been instructed to provide broader and more comprehensive discovery than the law requires, and to be inclusive when identifying the members of the prosecution team for discovery purposes. (The Department's policies do recognize that the requirement that prosecutors disclose more than the law requires may not be feasible or advisable in some national security cases where special complexities arise.)

Despite these and other robust efforts, prosecutors – like other professionals – will never be immune to mistakes. As a matter of policy, we strive to be perfect, even though we know perfection is impossible. We require our prosecutors to strictly obey the law in both letter and spirit, and we work to ensure that isolated mistakes are detected early, corrected, and do not prevent justice from being done.

### 4. Legislation in this area is unnecessary

With the release of the Schuelke Report, some have argued that legislation is necessary to alter federal criminal discovery practice. The Department does not share that view. As detailed above, since *Stevens*, the Department has addressed vulnerabilities in the Department's discovery practices. In light of these efforts, and the high profile nature of the discovery failures in *Stevens*, Department prosecutors are more aware of their discovery obligations than perhaps ever before. Now, of all times, a legislative change is unnecessary.

Moreover, legislation along the lines that some have suggested, would upset our system of justice by failing to recognize the need to protect interests beyond those of the defendant. It would radically alter the carefully constructed balance that the Supreme Court and lower courts, the Criminal Rules Committee, and Congress have painstakingly created over decades – a balance between ensuring the protection of a defendant's constitutional rights and, at the same time, safeguarding the equally important public interest in a criminal trial process that reaches timely and just results, safeguards victims and witnesses from retaliation or intimidation, does not unnecessarily intrude on victims' and witnesses' personal privacy, protects on-going criminal investigations from undue interference, and recognizes critical national security interests.

Unfortunately, witness safety concerns are more than merely theoretical. Even under the current system's careful balance between a defendant's right to a fair trial and witnesses' privacy and

safety interests, we have had witnesses intimidated, assaulted, and even murdered after their names were disclosed in pretrial discovery. Legislation requiring earlier and broader disclosures would likely lead to an increase in such tragedies. It would also create a perverse incentive for defendants to wait to plead guilty until close to trial in order to ensure that they learn the identities of all the people who would have testified against them.

The Department is also concerned that one such legislative proposal would require disclosure of information that is not substantially related to the defendant's guilt, even in cases where the defendant is pleading guilty. This requirement would result in the unnecessary and harmful disclosure of national security-related information and would compromise intelligence and law enforcement sources and methods. For example, despite the existence of the Classified Information Procedures Act, a new discovery standard could result in the disclosure of investigative steps taken, investigative techniques or trade craft used, and the identities of witnesses interviewed during counterterrorism and counterespionage investigations. Moreover, in cases involving guilty pleas – where a defendant is necessarily prepared to admit facts in open court that establish he or she committed the charged offense(s) – such legislation would require the unnecessary disclosure of the identity of undercover employees or confidential human sources, scarce investigative assets who, once revealed, may no longer be used to covertly detect and disrupt national security threats. Currently, in the national security context, we tell other countries that we will keep the information they share with us confidential unless we absolutely need to disclose it because of its exculpatory nature. Under such a bill, we would have to disclose an increased volume of information and disclose it more frequently, thus discouraging cooperation from our foreign partners.

In cases involving criminal charges against a defendant for child exploitation, impeachment information on the child-victim would need to be disclosed without regard to either admissibility or the substantial policy interests in keeping this information private, even if the evidence against the defendant included his own confession and videotapes of the defendant committing the abuse. In rape cases, information about a sex-crime victim's sexual history, partners, and sexual predisposition would need to be disclosed to the defense – again, regardless of admissibility. The disclosures required by the current legislative proposal cut against the important policy aims of child protection and rape shield laws.

Such legislation would also invite time-consuming and costly litigation over discovery issues not substantially related to a defendant's guilt, resulting in delayed justice for victims and the public and greater uncertainty regarding the finality of criminal verdicts. Inclusion of a provision for awarding attorney's fees would provide a significant incentive to engage in such collateral litigation. These concerns, among others, recently led the Criminal Rules Committee – a body populated by federal judges who are intimately familiar with these discovery issues – to reject a proposed amendment to Rule 16 to expand prosecutors' discovery obligations.

**5. Conclusion**

The *Stevens* case was deeply flawed. But it does not represent the work of federal prosecutors around the country who work for justice every day. And it does not suggest a systemic problem warranting a significant departure from well-established criminal justice practices that have

contributed to record reductions in the rates of crime in this country while at the same time providing defendants with due process. The *Stevens* case is one in which the current rules governing discovery were violated, not one in which the rules were complied with but shown to be inadequate.

The objective of the criminal justice system is to produce just results. This includes ensuring that the processes we use do not result in the conviction of the innocent, and likewise ensuring that the guilty do not unjustifiably go free. It also includes an interest in ensuring that other participants in the process – *i.e.,* victims, law enforcement officers, and other witnesses – are not unnecessarily subjected to physical harm, harassment, public embarrassment, or other prejudice.

For nearly fifty years, a careful reconciliation of these interests has been achieved through the interweaving of constitutional doctrine (*i.e.*, *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419, 439 (1995)), statutory directives (*i.e.*, the Jencks Act and the Crime Victims' Rights Act), and Federal Rules (*i.e.*, Rule 16; Rule 26.2). Legislation in this area would disturb this careful balance without a demonstrable improvement in either the fairness or reliability of criminal judgments and in the absence of a widespread problem. The rules of discovery do not need to be changed. Rather, prosecutors and other law enforcement officials need to recognize fully their obligations under these rules, must apply them fairly and uniformly, and must be given tools to meet their discovery obligations rigorously. This is what the Department has done since the Attorney General directed the dismissal of the conviction in *Stevens*. And it is what the Department will continue to do in the future, under the policies and procedures that have been implemented and institutionalized during the past three years.